**MYERSON et al. v. DENTISTS' SUPPLY CO. OF NEW YORK.**

District Court, S. D. New York.
March 4, 1946.

32

Roberts, Cushman & Grover, of Boston, Mass., Henry J. Lucke and Drury W. Cooper, Jr., both of New York City (Robert Cushman, of Boston, Mass., George Z. Medalie, of New York City, Richard F. Walker, of Boston, Mass., and Louis Haimoff, of New York City, of counsel), for plaintiffs.

John Vaughan Groner and Fish, Richardson & Neave, all of New York City (Wm. J. O'Hearn, Jr., of New York City, of counsel), for defendant.

HINCKS, District Judge.

This is an action for patent infringement, the patents in suit lying in the art of artificial teeth. The original complaint charged infringement of two patents—No. 2,202,713, issued May 28, 1940, on an application filed December 20, 1937; and No. 2,230,164, issued January 28, 1941, on an application filed June 1, 1939. A supplemental complaint charged infringement of two more patents—No. 2,202,712, issued May 28, 1940, on an application filed October 5, 1936; and No. 2,300,305, issued October 27, 1942, on an application filed September 27, 1941, and subsequently reissued as Reissue No. 22,331. By stipulation, "so far as relevant to the issues herein involved, said original (No. 2,300,305) and said reissue are identical," and to avoid confusion my findings and opinion will refer to the original only, it being understood that all such references are equally applicable to the reissue. The defenses are invalidity and non-infringement.

### Findings of Fact.

1. In the course of the trial it was stipulated that "in the judgment on the merits to be entered by the Court after trial it shall be adjudged that the complaint be dismissed with prejudice as to patent No. 2,230,164."

### Patent No. 2,300,305.

2. Patent No. 2,300,305 ('305) is directed to an artificial tooth composed of a relatively opaque body portion and an overlying and depending enamel portion of substantially complete transparency such that objects may be seen with well defined outlines through the substance of the tooth at its incisal portion. The incisal portion (of an upper tooth) is defined as that part of the tooth below the horizontal plane at the lowest point of the body portion.

Claims 1, 2, 3, 5, 6, 9, and 10 are in issue. Of these, claims 2 and 10 may be taken as typical. They are as follows:

"2. An artificial tooth having a downwardly and rearwardly sloping gingival surface, a pin-bearing surface and a plate-limiting shoulder, said tooth comprising a body portion of relatively opaque material and being provided with pins for attaching the tooth to a support, and an incisal portion of material of such transparency that the outline of an object may be seen through the substance of the tooth at said incisal portion, said portions meeting and merging in a contact zone whose nearest approach to the incisal edge is at a distance from the latter which at least approximates one-third the maximum horizontal distance between the labial and pin-bearing surfaces of the tooth, said contact zone gradually receding from the labial face and from the lateral edges of the tooth as it approaches the incisal edge whereby the tooth has a relatively transparent light-transmitting fringe of substantial depth, the transparency of which gradually diminishes inwardly away from said edges."

"10. An artificial tooth having a body portion of relatively opaque material, said body portion being provided with means for attaching the tooth to a support, and an incisal portion of relatively transparent material, said portions meeting and merging in a contact zone whose nearest approach to the incisal edge is at a distance from the latter exceeding one-third the maximum horizontal distance between the labial and lingual surfaces of the tooth, said contact zone gradually receding from the labial face and from the lateral edges of the tooth while concomitantly approaching the incisal edge whereby the tooth has a relatively transparent light-transmitting fringe of substantial depth, the transparency of which gradually diminishes inwardly away from said edges."

3. Claims 9 and 10, as issued, are claimed by plaintiff to derive from his original application Serial No. 78,674 filed May 8, 1936. Claim 2 of Serial No. 78,674 originally read: "An artificial tooth having a relatively opaque body portion and a trans-

parent incisal portion and adjacent lateral sides." By amendment dated February 10, 1937, the language just quoted was continued as follows: "the transparent incisal portion and adjacent lateral sides being gradually blended to the body." The claim in this form was rejected by the Patent Office and cancelled by the plaintiff whose next amendment was filed not until February 14, 1938. Claims 9 and 10 as issued were added by amendment in March, 1940. After the allowance of these claims (then numbered 23 and 25) as a result of action by the Board of Appeals, they were transferred to co-pending application Serial No. 412,574, whereupon Serial No. 78,674 was abandoned.

The remaining claims in suit, viz., claims 1, 2, 3, 5 and 6, derive from an application Serial No. 324,127, filed March 15, 1940, out of which they were divided by a divisional application Serial No. 412,574, filed September 27, 1941, which was thereafter enlarged, as above stated, by the inclusion of claims (23 and 25) transferred from Serial No. 78,674, which eventually issued under Patent No. 2,300,305 as claims 9 and 10.

4. On trial the plaintiffs expressly conceded that there was no patentable novelty in the relative distribution of body-simulating material and enamel-simulating material described and claimed in patent '305, nor in the composition of the ingredient materials. Their only claim of novelty rests upon the substitution of transparent enamel concededly known to the art for the translucent enamel theretofore used in the art as one element of the artificial tooth which in all other respects was well known to the prior art.

5. Prior to the so-called Vita publications, hereinafter set forth, the conventional means of simulating the appearance of a natural tooth was by using a colored and non-transparent porcelain for the body portion of the tooth to simulate the stronger color of the gingival third of the tooth, and to overlay or partly overlay this with a porcelain supposedly simulating the enamel of the natural tooth, which progressively thickened in depth of overlay from the gingival to the incisal edge and projected beyond the incisal end of the tooth-body to constitute the sole material in the incisal portion of the tooth, said enamel porcelain being although sometimes translucent never transparent, and being sometimes colored with blue-gray pigments in an attempted simulation of the dark incisal fringe of the natural tooth.

Both Ramsperger, French No. 703,460, February 9, 1931, and Chauvin, French No. 381,847, November 22, 1907, disclosed knowledge of the transparency of the enamel of the natural tooth. Ramsperger taught the use of an incisal tip of transparent enamel and Chauvin disclosed a layer of transparent enamel extending over the entire body portion of "almost opaque" porcelain and extending below the same to form the incisal fringe. Ramsperger, however, contemplated only a colored transparent enamel "which contrasts strongly" with the body portion. And Chauvin too contemplated the tinting of the enamel "for perfect imitation of the natural shades." He also criticized the prior art teeth for their too great transparency but I construe this criticism to be confined to the body portion of such teeth.

7. Certain German trade papers referred to herein as "The Vita Publications" were established as follows: "Vita Shades," with a stipulated date of 1928; "Vita Farben", published in 1930; "Das Aussuchen," etc., published in 1932; and "Vita," received in this country by 1934. The last of these publications described the Vita tooth as closely imitating nature in being "made of different porcelain layers, a dentine porcelain layer which gives to the tooth its basic colour, (and) *an enamel porcelain layer of high transparency and a bluish brilliancy * * *.*" Although the Vita publications describe a flat-back tooth, which was the conventional tooth of the European market, the teaching has equal application to the Vulcanite tooth, preferred in this country.

The first of these publications—Vita Shades—contained a disclosure which is epitomized in its statement—

"* * * it is a well-known anatomical fact that a natural tooth is composed of a yellowish-white body of dentine covered by a *bluish-grey transparent coat of enamel* of varying thickness. Near the cutting edge

of the tooth the dentine thins away entirely, and the front and back layers of enamel approximate to one another with little or no dentine between them. (See Fig. 9). The colour effect of natural teeth is based on the anatomical fact that the yellowish dentine shows through the bluish-grey enamel in varying degrees in different parts of the tooth. A *lifelike and natural appearance of artificial teeth can only be obtained by working on lines in imitation of nature's method.* \* \* \*"

"Vita" (1934) states:

"All prosthetic work has as its object the reproduction of the natural tooth. Therefore it follows that the natural tooth must serve as a model for the construction of the artificial tooth.

"In the natural tooth, the shading is obtained by the yellow-brown coloured dentine body showing through the enamel layer. From the structure of the natural tooth one perceives that the intensity of colour is greatest at the neck of the tooth, gradually growing less intense towards the incisal edge. *The enamel, which here as well as on the mesial and distal edge appears beyond the dentine, gives the tooth the appearance of being surrounded with a bluish translucent edge*" (opposite Diagram 1).

"The principle of constructing teeth which has been used hitherto entirely disregards these facts. \* \* \*" (opposite Diagram 2).

"This (prior) method, does not reproduce either the gradual shading off or the transparent edge on the periphery of the tooth. \* \* \*" (opposite Diagram 3).

"Contrary to this, the Vita Tooth is made of different porcelain layers, a dentine porcelain layer which gives to the tooth its basic colour, *an enamel porcelain layer of high transparency and a bluish brilliancy,* and the reinforced backing of hard porcelain. The dentine and enamel layer are superimposed nearly in the same way as the dentine and enamel of the natural tooth. Thus the line of demarcation referred to, is removed and a natural effect obtained" (opposite Diagram 4).

"As is the case with the natural tooth, the dentine shades decrease towards the incisal edge, where, in addition to the approximal surfaces, the bluish edge is shown, which is of such great importance for a natural appearance" (opposite Diagram 5).

" \* \* \* The shade effect obtained is conditional upon the depth of the enamel porcelain which a ray of light has to penetrate. The greater the depth, the higher is the degree of absorption, therefore the less yellow the shade effect. Therefore when observed from the lateral side the blue enamel colour predominates and from the facial side the yellow dentine colour" (opposite Diagram 6).

Diagram 5 shows "The natural course of the 'Vita' shade-line" and this shade line marks off, exactly as in the patent in suit, "the incisal portion of the tooth" which is of enamel "of high transparency and a bluish brilliancy." (Compare Diagram 5 with Plffs' Ex. B: Figs. 2 and 5.)

These Vita disclosures were originally cited in the Patent Office but, on objection by the inventor, were abandoned as prior references for lack of proof of a publication date anticipating the application herein (a lack of proof now overcome). Upon his appeal from a rejection based on references other than Vita, the inventor referred (in 1942) to the Vita publications as being "of record in this application, but of too late date to be of anticipatory value, and evidently written subsequent to the widespread introduction of the tooth of the present invention into Europe, as early as 1937," the plaintiffs having in fact made commercial distribution of teeth made in conformity with their '305 patent by that date.

The plaintiffs conceded that by the date of the trial herein Vita had produced teeth which embodied the disclosure of its publications. There was no evidence as to when Vita first began the commercial production of such teeth.

8. Except for experimental purposes, the patentee made no use of artificial teeth embodying the teaching of the '305 patent prior to April, 1936 when they were first put into commercial channels.

### Infringement of '305.

9. The defendant's teeth accused of infringing the patents in suit are represented by specimens included in Stipulation Ex.

H, each of which concededly exemplifies a line of product manufactured by the defendant prior to action brought and subsequent to the issue of the patent upon which the plaintiff's charges of infringement are predicated.

Of those charged to infringe patent '305, I find that Nos. 4, 16, 20, 22, 38, 40, 62 and 98 (which are charged with infringement of claims 1, 2, 3, 5, 6, 9 and 10), Nos. 2, 6, 14, 24, 42, 44, 46, 48, 74, 86, 88, 90, 100 and 136 (which are charged with infringement of claims 1, 2, 3, 5 and 6), No. 138 (charged to infringe claims 1, 3, 5 and 6), No. 106 (charged to infringe claims 2, 5, 6 and 10), and Nos. 110 and 112 (charged to infringe claims 1, 2, 5, 6 and 9), all are artificial teeth having an incisal fringe of such transparency that the outline of an object may be seen therethrough. In Nos. 18, 64, 66, 76, 102, 104 and 108, also accused, I find no such transparent fringe on the incisal portion. The plaintiff has failed to prove that in any of these teeth the entire "incisal portion" is transparent, the incisal portion being defined as stated in Paragraph 2 above.

### Patent No. 2,202,713.

10. Patent No. 2,202,713, issued May 28, 1940, on application Serial No. 180,725 filed December 20, 1937. It is directed toward an artificial tooth which is characterized by a feature simulating the striations of natural teeth.

Claims 8 and 9 are in issue. They are as follows:

"8. An artificial tooth of the kind in which the body portion has a layer of enamel fused to its labial surface, characterized in having an elongate insert embedded in said enamel layer, said insert differing in optical properties from the enamel layer and being of substantially triangular transverse section with one acute longitudinal edge thereof disposed substantially in the labial surface of the enamel layer and with its lateral faces diverging rearwardly from said edge within the substance of the enamel whereby light which enters through the enamel is reflected toward the observer with varying effect from surfaces of the insert which are inclined to the labial face of the tooth, said enamel, insert and body portion being interfused with each other.

"9. In combination in an artificial tooth, an enamel layer having a concave lingual face and a convex labial face, said enamel layer being designed to constitute the labial, mesial and distal surfaces of the artificial tooth, and an elongate separate and distinct insert of ceramic material differing in optical properties from the enamel layer and designed to simulate one of the longitudinal stria commonly occurring in natural teeth, said insert being embedded in the concave face of the enamel layer and fused with the enamel, the insert being substantially wedge-shaped in transverse section with its acute forward edge substantially flush with the labial surface of the enamel layer and with its lateral faces diverging rearwardly within the substance of the enamel whereby light which enters through the enamel is reflected toward the observer with an intensity which progressively decreases laterally from said edge of the insert."

11. The German Rothschild patent, No. 540,317, granted December 3, 1931, though primarily directed to a process for making artificial teeth by ceramic layers of different colors, discloses a tooth so constructed that a line of different colored porcelain located in an internal, rib-formed, groove in the lingual side of the labial layer may be seen through the translucent labial surface thus simulating "the vertical lines or shadings that frequently occur on natural teeth." The precise shape of this groove, and of the material it contains is not specified other than so far as may be implied from the fact that it is made by a rib or "protuberance" on a manually operated mould, called an inserter. The description is thus broad enough to cover either a V-shaped or a U-shaped groove in the labial layer. Rothschild does not specify a line continued down to the very incisal edge of the tooth; indeed the Rothschild drawings show a tooth in which the incisal portion is formed by an extension of the lingual layer. The drawings show also a labial layer which is somewhat convex on both sides, instead of being concave on the lingual side as specified by claim 9 in suit.

12. The German Wienand patent, No. 528,125 (1929) is a product patent for an artificial tooth embodying an insert of ceramic material of a different shade from the mass of the tooth, extending from the lingual to the labial surfaces of the tooth and running down the center. Since it is primarily aimed at imitating the "blood-charged nerve present in the natural tooth," the patent suggests that the insert be broadened as it extends from near the incisal edge to the neck. It is also stated that "the effect may be heightened considerably by broadening out the inserted section towards the lingual side of the tooth." [1] This broadening of the insert is shown as taking the form of a curved, outward flare, instead of the wedge-shaped form disclosed by Myerson.

13. Dennett, U. S. 589,383 (1897), showed a streak of porcelain tinted to simulate the pulp or nerve of the tooth inserted in the mould designed to be "very faintly seen through the translucent enamel and body portion." The shape and dimensions of the tinted nerve portion were not specified: the drawings showed only a flattish lozenge-shaped insert not extending to the incisal edge. Dennett contemplated the use of translucent body material as well as a translucent labial layer. His "nerve" was embedded in the body material.

14. The defendant's "New Hue" teeth, as exemplified by stipulation, Exhibit H, No. 74 (for a photograph of which see Exhibit DDD), shows a stripe or striation produced by a triangular wedge-shaped structure projecting from the body portion of the teeth and extending into a V-shaped groove in the lingual side of the labial enamel layer with the point of the wedge located substantially on the labial surface of the teeth. The stripe extends longitudinally from close to the incisal tip to the central part of the labial surface.

The defendant's "New Solila" teeth, as exemplified by stipulation, Exhibit H, No. 104 (for a photograph of which see Exhibit FFF), show a triangular strip of body material projecting into the enamel layer which is of substantially triangular or wedge-shaped cross-section with slightly irregular outline. This striation also extends from close to the incisal tip to the central part of the tooth.

In both of these teeth of the defendant, the striation consists of an insert which is an integral part of the plastic body material of the tooth. In the "New Hue" teeth, the labial enamel layer in the mould while still plastic is grooved by a rib on a cooperating shader mould and then biscuited; then plastic body material is deposited on the enamel layer in the mould in such quantity that by the pressure of a mating lingual mould it is forced in the groove in the labial layer. The "New Solila" teeth are made similarly except that the groove is made by a manually operated instrument instead of by a shader mould, which gives it a slightly irregular outline.

The method used by the defendants in producing the stripes contained in their "New Hue" and "New Solila" teeth was not a method expressly disclosed in the '713 patent, but the "New Hue" and "New Solila" product embody all the elements of the claims in suit as therein described and limited.

15. In July, 1937, plaintiffs made a large-scale commercial offering under the designation of "True Blend", of teeth which embodied both the transparency feature of the '305 patent and the striation feature of the '713 patent. The demand for the new tooth was prompt and strong throughout the United States and many foreign countries.

16. Prior to the introduction of the True Blend teeth, the gross sales of the plaintiffs' entire, prior-art, product, and their expenditure for advertising had been substantially as follows:

|  | Gross Sales | Advertising Expense |
| --- | --- | --- |
| 1932 | $ 56,000 | $2,400. |
| 1933 | 66,000 | 2,100. |
| 1934 | 102,000 | 3,200. |
| 1935 | 86,000 | 2,700. |
| 1936 (7 mos.) | 37,000 | 1,300. |
| 1936–37 (12 mos.) | 109,000 | 3,300. |

The sales for 1936–37 included a comparatively small volume of the patented "True Blend" teeth.

---

[1] From the stipulated translation in Respondent's Exhibit 8.

Thereafter the gross sales and advertising expense were as follows:

| | Sales under '305 and '713 | All other Sales | Advertising |
|---|---|---|---|
| 37–38 | $160,000 | 98,000 | 1,300 |
| 38–39 | 260,000 | 171,000 | 20,000 |
| 39–40 | 266,000 | 154,000 | 26,000 |
| 40–41 | 334,000 | 179,000 | 45,000 |
| 41–42 | 415,000 | 197,000 | 68,000 |
| 42–43 | 560,000 | 272,000 | 50,000 |
| 43–44 | 605,000 | 350,000 | 64,000 |

The sales prices of plaintiffs' patented products were generally higher than the prices of competing products. The increased sales of plaintiffs' patented product served to increase the sales of its unpatented product.

The denture base of acrylic material was introduced in 1938 and was generally viewed by the trade as a substantial improvement over the rubber or other materials theretofore used.

On the whole, I find that the plaintiffs' increasing commercial success since 1936 may fairly be attributed to the transparency feature of the '305 patent. There is no evidence, however, upon which it could be found that the striation feature of the '713 patent made any substantial contribution to the plaintiffs' commercial success. Indeed, from testimony that the defendant eliminated the striation feature from a certain line of its own product without unfavorable reactions from the trade I find that the plaintiffs have failed to prove that the commercial success achieved was attributable to the presence in their product of the striation feature of the '713 patent.

17. It has not been proved that Myerson, except for experimental purposes, made public use of teeth which embodied the insertion of claims 8 and 9 of the '713 patent prior to April 1936.

### Patent No. 2,202,712.

18. Claim 5 of this patent was the only claim thereof which had been put in issue under the supplemental complaint. By reply brief after trial, the plaintiffs withdrew the charge that this claim had been infringed.

### Opinion.
### As to Patent No. 2,300,305.

The defendant has raised as an independent defense the contention that the patentee made commercial use of his claimed invention by the distribution and sale of its "True Blend" line of teeth, which concededly embodied the claimed invention, within the two years prior to his filing date.

The earliest application by the plaintiff which touches the subject-matter was Serial No. 78,674. This was filed on May 8, 1936, and its relevant history is set forth in Paragraph 3 of the Findings. As this finding shows, claim 2 as originally submitted on Application Serial No. 78,-674, covered broadly "an artificial tooth having a relatively opaque body portion and a transparent incisal portion and adjacent lateral sides." This was a concise statement of the broad conception which underlies every one of the claims in suit. The claims as finally issued stated not a different subject-matter of claimed invention, as in Muncie Gear Works v. Outboard Marine & Mfg. Co., 315 U.S. 759, 62 S.Ct. 100, 86 L.Ed. 1171, upon which the defendant relies, but merely a narrower exemplification of the same claimed invention. They are entitled to the 1936 filing date. Interchemical Corporation v. Sinclair & Carroll Co., Inc., 2 Cir., 144 F.2d 842, reversed on other grounds, 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644. See also Proctor & Gamble Mfg. Co. v. Refining, Inc., 4 Cir., 135 F.2d 900, at page 904; Western States Machine Co. v. S. S. Hepworth Co., 2 Cir., 152 F.2d 79, and Michigan Carton Co. v. Sutherland Paper Co., 6 Cir., 29 F.2d 179, at 184; Balaban v. Polyfoto Corporation, D.C., 47 F.Supp. 472. It follows that they are not invalidated by the patentee's public use which was found (Finding No. 8) not to have begun until 1936.

The defendant further contends that the claims in suit are fatally indefinite. The force of this defense, as also of other defenses which I will discuss later, requires careful·study of the scope of the claims in the light of the prior art.

Concededly, an artificial tooth composed broadly of a body portion simulating the

dentine of the natural tooth and an overlying layer of porcelain as a substitute for the enamel of the natural tooth was old in the art. The shape and comparative opacity of the body portion and the shape of the enamel portion were also old, and there was no novelty in using for the enamel portion overlying the body portion and depending therefrom to form an incisal mass a porcelain which, at least prior to the Vita publications, was translucent. The only claim of novelty for the tooth of this patent was its substitution of a "transparent" material, which in itself was well known to the art, for the translucent material theretofore used in the combination.

But obviously "transparent" is an adjective which, though sufficiently definite when applied to an abstract quality, when applied to specified materials lacks precise definition. It is used in the patent as the opposite of "opaque" which also, given practical application, lacks precise definition. And between the two is the field of the translucent which partakes of the properties of both and is equally indefinite. Translucent porcelain, unlike the opaque, transmits some light—enough to show the clearly-defined shadow of an object in close juxtaposition and directly exposed to the light source. But it so diffuses the light which it transmits that of such an object nothing but the shadow is visible.

In effect, the patentee is claiming as his field of monopoly teeth having an incisal portion of such transparency as lies within a maximum and a minimum transparency test. His test of minimum transparency is that "the outline of an object may be seen through the substance of the tooth at its incisal portion." However, the plaintiffs' commercial product which concededly embodies the claimed invention has a transparency of such limited dimensions that at most only an object in immediate juxtaposition can be seen therethrough—a limitation which suggests a capacity for light-diffusion differing only in degree from that of a translucent substance. I doubt whether such a definition, expressed only in terms of function, is sufficiently definite to mark a boundary of the field of a valid monopoly. General Electric Co. v. Wabash Appliance Corporation, 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402.

For his definition of maximum transparency the patentee specifies the use of enamel of "substantially complete transparency." None of the plaintiffs' commercial product has this characteristic: As just noted only an object in close juxtaposition to such a tooth can be seen therethrough. There is in evidence a plastic tooth (made only for purposes of illustration) of which the incisal portion is indeed transparent—sufficiently so that print can be seen therethrough. But its effect is ghastly: a patent teaching transparency of such dimensions would lack all utility. To have validity the disclosure must be construed as calling for a transparency less than complete.

Between these definitions which purport to mark off the field of the claimed monopoly other claims specify an "enamel relatively more transparent than," "the relatively opaque ceramic material of the body portion." But this comparative limitation fails to mark any measurable distinction between prior art translucency on the one hand and excessive transparency at the other extreme. Certainly in the defendant's prior art Trubyte teeth, for example, the enamel incisal edge has less opacity than its body portion and the plastic tooth in evidence has an incisal portion of substantially greater transparency than that of the claimed invention.

We have then this situation. The only disclosure of any possible novelty is the use of a porcelain enamel which is not too transparent and yet is more so than that of the prior art: the enamel material must have a capacity for transparency lying between these extremes. And even if the test of outline-visibility were a sufficiently definite test of the limit of minimum transparency, which I doubt, the field of claimed monopoly is fatally indefinite for lack of any definition of the boundary of maximum transparency.

I therefore hold all the claims in suit invalid for indefiniteness. General Electric Co. v. Wabash Appliance Corp., supra; Guidet v. City of Brooklyn, 105 U.S. 550, 26 L.Ed. 1106. Preston v. Manard, 116 U.S. 661, 6 S.Ct. 695, 29 L.Ed. 763.

The claims are equally invalid, I think, for lack of invention. In the first place, they distinguish over the prior art not in kind but only in a matter of degree. As to this, as plaintiffs point out, it is true that the optical properties of transparent and translucent materials are different. But the only difference involved here is essentially one of degree. Granted that the teeth of the prior art were so lacking in transparency as to scatter or diffuse such light as passed through, the teeth of this patent do the same to a somewhat lesser degree. This is practically demonstrated by the fact that plaintiffs' commercial product satisfies the object-outline test only for an object held in close juxtaposition to the tooth: an object slightly removed from the tooth is no more visible through its incisal portion than through ground glass or any other translucent material. And theoretically the same conclusion necessarily follows from the conceded fact that the enamel porcelain of the plaintiffs' teeth—porcelain which satisfies the patent specifications—is replete with microscopic bubbles which cannot be eliminated by firing within temperature ranges which are feasible in the manufacture of teeth of ceramic materials. Necessarily these bubbles must have some scattering effect on the light which passes through. Thus the specified material of the incisal portion has an optical function which differs only in that it produces somewhat less diffusion than the material of the corresponding part of the prior art. This difference is no more patentable than the substitution of a smaller for a larger gear in a machine-patent. The smaller gear will produce more speed and less power in the machine: and the "transparent" enamel will produce less diffusion of light through the incisal portion.

I was somewhat helped to this conclusion when I attempted to apply the "visibility of outline" test to the forty-one accused teeth of the defendant. Of these, as my findings show, many seemed to satisfy the test but even of these there were several so close to the borderline as to make their classification difficult. And a comparison of those which satisfied the test with those which to me seemed not to satisfy the test, and indeed with many prior art teeth

in evidence, disclosed no difference in the degree of transparency which could be deemed critical or patentably distinguishable.

On the whole, I am satisfied that the claims are invalid under the doctrine of Dow Chemical Co. v. Halliburton Oil Co., 324 U.S. 320, 329, 65 S.Ct. 647, 89 L.Ed. 973; Dykema v. Liggett Drug Co., Inc., 2 Cir., 94 F.2d 648; Kwik Set, Inc. v. Welch Grape Juice Co., 2 Cir., 86 F.2d 945; David Belais, Inc. v. Goldsmith Bros. Smelting & Refining Co., 2 Cir., 10 F.2d 673; certiorari denied 271 U.S. 687, 46 S.Ct. 639, 70 L.Ed. 1152; and Brady Brass Co. v. Ajax Metal Co., 3 Cir., 160 F. 84, certiorari denied 210 U.S. 433, 28 S.Ct. 762, 52 L.Ed. 1136.

A more fundamental defect of the patent is its lack of invention over the teachings of nature. The art had long since learned to simulate nature by constructing the artificial tooth with a body portion of dentine-simulating porcelain, overlaid with translucent porcelain obviously intended to simulate in appearance the enamel of the natural tooth. And as the patentee testified, at least some natural teeth have enamel which is transparent and technicians in the art "have the idea that it (i. e., the enamel of natural teeth) is transparent." Notwithstanding, the art had been using an enamel porcelain not sufficiently transparent to give the most natural effect. One would have thought that long before it would have followed the teaching of nature to use a more transparent enamel which was available to the art, even though the rodlike construction of natural enamel could not be duplicated. However, the long delay in making this improvement demonstrates, I think, that the improvement was not obvious, and the public response to the plaintiffs' commercial product—not to mention the response to the defendant's accused product—demonstrates that the use of the enamel with greater transparency was indeed an improvement.

Nevertheless, the improvement though real cannot be held patentable. Merely because the art had failed to recognize that the appearance of the natural tooth was partly attributable to the transparent

quality of its enamel, it did not require invention to substitute in an artificial tooth for the translucent enamel theretofore used a porcelain which was ready at hand which had the transparent quality which was known to characterize nature's enamel. General Electric Co. v. Jewel Incandescent Lamp Company, 66 S.Ct. 81. If the Board of Appeals in the Patent Office had had before it the decision just cited and the frank concession of the patentee that the enamel of natural teeth was known to be transparent, it would not, I think, have reversed the action of the examiner who had rejected the contention that patentable invention was required to use a transparent material which was available to the art where nature used another transparent material.

Nor did the substitution involve invention over the prior patented art in the light of Ramsperger and Chauvin. (Finding, Par. 6.) I am not persuaded that the French word "transparente" in these patents meant *translucent* or *non-transparent,* as the plaintiffs in their effort to avoid these references contend.

Still less invention does Myerson show over the disclosure of the Vita publications. These publications (Findings, Par. 7) emanate from a German manufacturer. The plaintiffs contend that the use in these publications of the German word "transparent" as applied to a natural tooth like the use of the word "transparente" in the French patents just referred to indicates that the word throughout was intended to mean *non-transparent* or *translucent*—for which there is some dictionary support. And so the plaintiff urges that the publications go no farther than to teach the production of "a natural appearing artificial tooth by using blue or other coloring in the enamel, and by using for the base of the colored enamel, a porcelain which, according to the first two publications, is, in the absence of a defining adjective, of the regular prior art non-transparency, but which in the 1932 and 1934 pamphlets is designated as 'transparent.'" And this interpretation of the Vita disclosure is further supported, the plaintiffs contend, by these facts or alleged facts: that even subsequent to the Vita publications the Vita product embodied

an enamel which was translucent as distinguished from transparent, and that the Vita disclosure is presumably related to the European, flat-back, style of artificial tooth used in dentures the material of which on the lingual side extends close to the incisal edge—substantially closer than in the American "Vulcanite" form of denture. Why, indeed—so the argument runs—should a European manufacturer concern himself with a disclosure appropriate only for the American style of tooth and why, if concerned only with the European flat-back tooth, should he teach the use of truly transparent enamel for the incisal portion of its tooth if its incisal portion—or the greater part thereof—is backed by an opaque denture-material which would show through a truly transparent tooth and thus destroy its life-like appearance?

But as to this, it must be remembered that it is the Vita publications—not the product—which are now cited against the patent in suit. Moreover, there is no evidence that Vita was concerned only with the European market where the flat-back tooth was predominant. Indeed, there is in evidence (Ex. Stip. F, Ex. L-3) a commercial specimen of the Vita product purchased in Latin America as early as 1937 or 1938 which has the Vulcanite shape.

Very plainly the Vita publications disclose the use of transparent enamel which is the gist of Myerson's "discovery." If we are to rely upon primary dictionary meanings, even the German texts disclosed the use of an enamel which was transparent in the same sense that that word is used in the patent in suit. Especially in view of the patentee's concession that at least some natural teeth are transparent, the use of the German word "transparent" as descriptive of natural teeth may not fairly be interpreted as meaning translucent or non-transparent. In this connection it is noted that the '305 patent itself describes the enamel of the natural tooth as "substantially transparent or at least translucent." But however that may be, the translation, just as much as the original, was a publication within the meaning of the patent law, and there is no basis for the contention that to the American technician the words "transparent" or "transparency" in the Vita

publication would have any different meaning, or disclose any different teaching, than the same words in the patent in suit. The Vita disclosures definitely teach the desirability of a transparent incisal fringe.

It appears to me also that the plaintiff's attempt to distinguish the disclosure of the Vita publications is somewhat at variance with the position of the patentee in the Patent Office. There, in the course of the prosecution of Serial No. 78,674, File Wrapper of which is in evidence as Ex. B–8, the examiner cited one of the Vita applications which had been received in the Patent Office in 1938; no evidence of an earlier date of the publication was then available to the examiner. The patentee accordingly succeeded in having the reference withdrawn on the ground that the publication was not shown to precede the plaintiff's filing date. On his appeal in the Patent Office he spoke of the Vita publications as being "too late to be of anticipatory value and evidently written subsequent to the wide-spread introduction of the teeth of the present invention into Europe, as early as 1937." Thus he impliedly suggested that the Vita in its publications copied his disclosure as exemplified by his commercial product: on the record as it stood in the Patent Office this was a possibility. Since his commercial product had the transparent incisal portion as claimed in his patent, he impliedly admitted the identity between the Vita disclosure and his own claimed invention. Such an admission, of course, does not have the force of an estoppel but it has, I think, some probative weight which serves to corroborate my own independent conclusion that the teaching of the Vita publications and of the patent in suit is substantially identical.

In any event, it is worth noting that in allowing the claims in suit the Patent Office did not find them patentable over the Vita disclosure: In the ex parte proceedings in the Office the prior date of the Vita publications had not been proved.

Although for the several reasons stated I must hold the claims in suit invalid, I apprehend that the better practice suggests that I express my views on the issue of infringement as well.

On the trial the defendant's witnesses denied the presence in the accused teeth of a "transparency" within the definition of the claims. The plaintiff, however, insisted that the teeth of each of the forty-one lines of manufacture were transparent to the extent that "the outline of an object might be seen through the substance of the tooth at said incisal portion." And each party had some support from its expert. Faced by this conflict, there was nothing for me to do but to examine each of the forty-one specimens myself in the light box provided by the plaintiff. The findings recorded in Paragraph 9 are the product of this examination. Whether the findings were affected by the resultant strain on my eyesight I cannot absolutely certify. However, I have sufficient confidence to hold that the plaintiff has proved by a fair preponderance of the evidence that for the specimens indicated the outline of an object can at least be seen through the accused teeth at their incisal fringe.

But this I think is not sufficient to make out a case for the plaintiff on the issue of infringement in view of the explicit limitations in the claims. For under the claims the area of transparency extends to the "incisal portion" of the tooth which is specifically defined as that portion thereof which is below (when speaking of an upper tooth) the horizontal plane passing through the tooth at the bottom of its body portion. And the vertical length of the incisal portion as thus defined is expressly limited: in claims 1, 2, 3, 9 and 10 it is stated to be about ⅛ the horizontal distance between the labial surface of the tooth and its pin-bearing surface on the lingual side and in claims 5 and 6 it is stated to extend (vertically) for "a substantial distance." The specifications recite that the length of the incisal portion as thus defined will "usually be of the order of ¹⁄₁₆ of an inch or more." In the Patent Office this minimum limitation on the length of the incisal portion was deemed critical apparently in order to distinguish the tooth of the claimed invention over Ramsperger and Chauvin. I agree. If the claims are valid, only teeth shown to have an entire incisal portion of the required transparency can be held to infringe;

a transparent tip on the incisal portion is not enough.

I am unable to find any evidence that the transparency of any of the accused teeth, even of those found to have a transparent incisal fringe, extends to the entire length of the incisal portion. Certainly I cannot make such a finding on the basis of a visual inspection of the accused teeth. It is impossible to tell by inspection precisely where the horizontal plane which defines the upper boundary of the incisal portion passes through the surface of the tooth or whether the area of transparency observed in the immediate vicinity of the incisal edge itself extends upward for the full distance claimed. The incisal portion is wedge-shaped in longitudinal cross-section with the result that its upper part just below the body portion is thicker than its incisal edge. It well may be that due to the greater number of bubbles to be expected in the thicker mass of porcelain at its upper part the area of transparency is limited to its lower part. Without more definite proofs I cannot hold that the claims are infringed.

If my technique in making these findings shall seem crude or naive, that fact will lend weight to my holding that the claims in suit fail to show any critical difference over the prior art which might serve as a more authentic test of claimed infringement.

### Patent No. 2,202,713.

To the '713 patent also, there is interposed a defense of invalidity because of the patentee's prior use. The defendant stresses the fact that the claim which was originally filed as claim 12 did not specify that its insert ("elongate narrow body of relatively opaque ceramic material") was stated to have as a characteristic "lateral faces diverging rearwardly from said edge within the substance of the enamel," or that "said enamel, insert and body portion (were) interfused with each other," as now specified in claim 8; or that the tooth of the invention had "an enamel layer having a concave lingual face and a convex labial face."

It is true, I think, that the limitations just mentioned were injected into the claims in order to obviate rejections by the examiner. However, it appears to me that there is nothing in the claims as issued which was not broadly claimed either expressly or by fair implication in claim 12 of the original application. The claims as granted cover an invention narrower, to be sure, but not different from that originally claimed. Thus here, too, the case does not fall within the rule of the Muncie case, and the claims in issue are entitled to a filing date as of December 20, 1937. Since the defendant has failed to prove a use by the patentee prior to April, 1936, this defense is not sustained.

A mass of evidence was offered and received relating to the unpublished teachings and work of one Dr. House and his disciples, which had been pleaded as an anticipation of the '713 patent. The only evidence of any reduction to practice by these technicians consisted of tooth specimens which according to the oral testimony of the defendant's witnesses had been made prior to December 20, 1937. The plaintiffs attacked the date of these teeth and contended that at most they were specimens of surface-staining not within the claims here in issue.

There was no documentary evidence as to the date of these teeth: the oral evidence as to dates, except as to Exhibit KC–K2, was to me far from clear and convincing. It was apparent that House and the others allegedly responsible for these teeth from time to time had been associated with pupils and assistants who had access to the receptacles in which these teeth were kept and the background of these exhibits was such that it would have been possible and entirely natural for their contents to have been changed from time to time either with or without the knowledge and recollection of the witnesses who gave such evidence as there is as to the date of these exhibits. When these witnesses throughout the anticipatory period were apparently handling a multitude of specimens illustrating a variety of features, I think it dangerous to rely solely upon their recollection of the date of origin of the particular specimens which are now claimed to anticipate. In such a situation I can only hold that the alleged anticipations have not been proved with the certainty required. The Barbed

Wire Patent (Washburn & Moen Mfg. Co. v. Beat 'Em All Barb-Wire Co.), 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154; General Motors Corporation v. Leer Auto Supply Co., 2 Cir., 60 F.2d 902.

Space does not permit of a detailed discussion of the evidence relating to the state of knowledge of each of these technicians or of all the handiwork which is claimed to exemplify their knowledge. But defendant's Ex. W–4–3 was particularly relied upon in its brief and some discussion of the evidence relating to this exhibit may be helpful. According to the testimony of the defendant's witness, Dr. Loop, this was one of some forty-seven loose teeth first appearing upon the scene of this case movably mounted on a wax mat constituting the base of a box in the possession of defendant's counsel, when at a deposition in California in December, 1942, it was handed to Dr. House, and identified by him as belonging to Dr. Loop. There was no evidence as to when it came into the hands of defendant's counsel or to account for its continuous previous custody. When defendant's counsel showed Dr. House the exhibit (whether the box was then open or not does not affirmatively appear) he promptly identified it as being an exhibit belonging to Dr. Loop and used by him at clinics as long before as 1931. On being asked to examine the teeth in the box which he had already identified, he stated that they comprised a part of the exhibit used in 1931. Whether this was a blanket examination of the forty-seven teeth at a single glance or a careful inspection of each tooth does not appear.

When Dr. Loop shortly thereafter testified, his identification of the exhibit was scarcely more explicit. As to the teeth contained therein he· testified that they were made "some by me and some by my laboratory technicians." No contemporaneous laboratory notes of the manufacture were produced. When asked to state how they had been made he orally described a process whereby after the labial layer of "enamel" porcelain had been laid in a labial mould it was ditched from the lingual side by a V-shaped indentation with a sharp instrument, one wall of the ditch being substantially perpendicular to the labial surface: this ditch was filled with porcelain of the desired color and the tooth was then completed by adding the body porcelain and by the application of a lingual mould, and then baked into a biscuit which was later glazed in the conventional way. The witness then identified Ex. W–4–3 as one made by the process just described. The container, Ex. W–4, however, contained a variety of teeth made by various processes including teeth with striations produced by external means.

Dr. Loop further testified that his various writings on dental ceramics had never disclosed the method of mould-staining described above, but that for an hourly period each year he had lectured to a class of students of the College of Dentistry, University of Southern California, on "the staining of teeth," and at that lecture showed them the exhibit above described. Although these lectures were said to have been given from about 1931 to the present time, no manuscript or notes of the lecture were produced nor was any student produced to tell what, if anything, he had been taught about the art of staining. Loop's testimony that he lectured on "the staining of teeth," even if accepted, does not demonstrate a sufficient disclosure of his knowledge or practice to constitute an anticipation. Block v. Nathan Anklet Support Co., 2 Cir., 9 F.2d 311.

However, there are passages in his testimony given in 1942 which make one wonder whether Dr. Loop's memory of the content of his unpublished lectures given five years earlier is a sufficient basis on which to find an anticipation. Cross-examination disclosed that he had completely forgotten the content of some of his earlier published writings on a kindred subject matter. Moreover, he explained that few practicing dentists have tooth moulds; that consequently any staining undertaken by them must be by work on the exterior of the biscuited or completed tooth. One wonders therefore whether in a lecture to students who were presumably to become practicing dentists, he would not naturally minimize discussion of staining in the mould, which might be expected to be beyond their reach, and expatiate rather on the art of staining from the exterior.

However, as to this he explained that he deemed it important that the practicing profession should know what could be accomplished by staining in the mould in order to create a demand for mould-staining upon the manufacturers. Yet although Dr. Loop, for a time at least, had been intimately associated in research work with Dr. House, who in turn had commercial connections with tooth manufacturers including the defendant, there was no suggestion that he had ever used these contacts or had directly tried to induce manufacturers to produce teeth embodying the built-in striation to which he testified.

From this Loop exhibit, Dr. Clark, the defendant's expert at the trial, was asked to select for cross-sectioning "those teeth as to which you believe there is staining in the mould." He selected four such teeth upon which, after the cross-sectioning had been accomplished, he testified as to his observations. In Nos. 1 and 2 an arcuate band was disclosed about which Loop had said nothing. As to No. 4, the longitudinal section showed a brown arcuate stain between which and the labial surface was some blue stain as to which Loop had said nothing.

No. 3, upon which the defendant on brief principally relies, showed a line-stain having a triangular cross-section with the apex toward the labial surface but substantially beneath the surface. Dr. Clark's conclusion, cautiously expressed as an opinion, that this colored material had been inserted in the mould was based largely on the shape of the insert and the apparently undisturbed labial surface.

I cannot feel, however, that the validity of the conclusion is fully demonstrated. The evidence showed some practice, especially in connection with crown jackets, of packing colored porcelain to simulate a striation into a cut made in a biscuited tooth and filling the remainder of the cavity with enamel-porcelain and glazing. I cannot say with assurance that such a process was not used in making each of these exhibits taken from Ex. W-4.

However, for its bearing on an article pa ..t uncertainties as to the method by wh . . a claimed anticipation was made are material only as tending to show that the anticipation made no substantial contribution to the art. I cannot hold that the exhibition each year of forty-seven teeth to a class of students for the brief inspection possible in a lecture period would teach how to make any one or more of the teeth thus exhibited when even the experts with the aid of microscopic examination after cross-sectioning are in disagreement as to what the exhibit teaches. Cf. Picard v. United Aircraft Corporation, 2 Cir., 128 F.2d 632; certiorari denied 317 U.S. 651, 63 S.Ct. 46, 87 L.Ed. 524.

For this reason as well as the inadequate proofs of date, I hold the Loop practice and exhibits have not been shown to anticipate.

As for Ex. KC–K2, over which there has been voluminous controversy, I incline to think a prior date has been sufficiently proved. Certainly the evidence as to date is substantially stronger than that relating to other contested exhibits; a wholly credible witness testified to his continued custody of the entire KC-K exhibit under such circumstances that the danger of unknown or forgotten substitutions was negligible. However, the only evidence as to how this exhibit was made and as to the knowledge of its maker is such as may be inferred from an inspection of the tooth and its cross-sections. From this evidence I am not convinced that the striation was produced in the mould. But the striation, whether produced in the mould or by external insertion, does not constitute a precise anticipation because it lacks the wedge shape specified by Myerson. Also it was not shown that the tooth itself or the knowledge which resulted in its manufacture was sufficiently brought to public attention to constitute a substantial contribution to the state of the art. Picard v. United Aircraft Corporation, supra. On the contrary, the tooth had apparently remained since its manufacture in the possession of its maker and her heirs wholly without exposure to the scrutiny of others.

An immense volume of evidence centers about the anticipatory practice alleged to have been carried on by the defendant itself in 1930 in its factory at York. An important part of the defendant's evidence on this issue, as originally given on pre-trial

deposition, was conceded to have been incorrect and was withdrawn. And the final content of the record on this issue contained numerous apparent inconsistencies which gave substantial color to the plaintiffs' accusations that this defense was fraudulently fabricated by officers and employees of the defendant for purposes of this suit. However, my own mental difficulties in grappling with the numerous exhibits relating to this issue lead me to recognize a possibility that the contradictions and inconsistencies in the defendant's evidence may derive from genuine confusion as distinguished from fraud. The plaintiffs' attack on the bona fides of the date-stamp in the defendant's mould, Ex. Y–8, has sufficient force to preclude me from finding that the ostensible date has been proved. Whether the evidence as to this item is such as to justify a finding of fraud, is a closer question. I therefore pass the question of fraud. It is enough to hold that the defendant's claimed prior use has not been proved.

The defense of lack of invention is sustained. I am unable to find that the '713 patent shows patentable invention over Rothschild and Dennett. (Findings, Pars. 11 and 13.)

It is true, of course, that Rothschild did not disclose all the detail of the claims in issue; he did not specify a V-shaped groove which would give the "elongate insert" contained therein a triangular or prismatic cross-section with an edge of the prism close to the labial surface. But the evidence does not show that this detail was indispensable to the presence of utility in the article; for aught that appears a tooth having to a substantial degree the desired visual appearance might be obtained without compliance with the precise detail specified by Myerson. And whether so or not, Myerson showed no more than a limited form of Rothschild's broader disclosure.

Likewise the Wienand patent (Finding, Par. 12) does not comply exactly with the specifications of Dr. Myerson's tooth; the insert does not extend to the incisal edge and is not necessarily wedge-shaped in cross-section. It does point out, however, that the effect may be heightened by broadening out the insert toward the lingual side of the tooth, thus performing at least to a substantial extent the same function as the similarly-shaped insert in the Myerson tooth.

It must be remembered that we are not here considering the patentability of a specified method; Myerson himself freely conceded that once he had conceived the article itself, there was no particular difficulty in devising a method to give it physical reality. But Rothschild had earlier disclosed a striation built into an artificial tooth by the use of a ceramic material having a color different from that of the porcelain constituting the overlying labial layer—an internal striation which would be discernible through the labial layer. And this, I think, was the gist of Myerson's "discovery." If, as Myerson contends, the striations of Rothschild and Wienand did not extend to the incisal edge, and if—as the evidence shows—in the natural tooth striations commonly do extend to the incisal edge, certainly it did not involve invention over Rothschild to conceive of a tooth with the striations so extended. This was merely a modification of Rothschild which nature itself suggested. And even if Myerson's detail as to the shape and position of his "elongate insert" be deemed an improvement over Rothschild and Wienand, it was an improvement that might have been discovered by the patient experiment of any technician skilled in the art.

The Dennett disclosure is somewhat further afield. But when Dennett had shown an artificial tooth in which a nerve-simulating insert was faintly visible through the translucent enamel layer and the translucent body material in which it was embedded, it would appear to involve no exercise of the inventive faculties to conceive of a tooth having a striation-simulating insert showing through the enamel layer in which it was imbedded.

Indeed, the absence of patentable invention in these claims seems to me too plain to be saved by implications arising from the commercial success of the Myerson product. However that may be, it must be noted that the Myerson product was characterized not only by the striations

covered by these claims but also by the "transparent" enamel which was an indispensable element of the tooth covered by Patent '305. It is reasonable to attribute the notable commercial success of the product to the latter feature. The evidence supports that conclusion (Finding, Par. 16) and I am not satisfied that the striation feature made an essential contribution to the success achieved.

This fact was not developed in the ex parte proceedings in the Patent Office. And in the light of the antecedent proceedings in the prosecution of the claims a study of the opinion of the Patent Board of Appeals holding these claims allowable suggests strongly that its action would have been otherwise, and that it would have sustained the examiner by rejecting the claims, if it had understood that the plaintiff's commercial success was attributable, as now seems plain, to a feature not covered by these claims.

The defendant contends that notwithstanding the findings contained in Paragraph 14, which seem not to be disputed, neither its "New Hue" nor its "New Solila" teeth infringe because an integral part of the body material is used to form the insert which is therefore not "separate and distinct" as specified by claim 9.

But as to this, the requirement of the claims in suit is for a "separate and distinct insert of ceramic material *differing in optical properties from the enamel layer.*" There is no express requirement in the claim that the insert shall be separate and distinct from the body portion of the tooth. And there is no sound ground for the implication of such a limitation.

The specifications, to be sure, specify that the insert shall extend upwardly from the incisal area so that its upper portion is "in front of the body portion and projects forwardly from the latter" into the labial layer. And claim 8 requires that the "enamel, insert, and body portion be interfused with each other." The defendant contends that the language just quoted imports an insert which once was separate from the body: that an insert made by forcing an integral part of the body material into the groove in the enamel cannot infringe.

There is, however, nothing in the patent to suggest that the material of the insert and the body portion may not be homogeneous. And if the insert be viewed, as it may, as a ridge fused upon the comparatively flat surface of the body portion, the language of the claim is as well adapted to cover a ridge, or insert, of body material as of any other kind of material—provided of course that the insert shall have optical properties differing from the material of the enamel layer.

That the defendant's method of manufacture was not disclosed by Myerson is immaterial. Hookless Fastener Co. v. G. E. Prentice Mfg. Co., 2 Cir., 75 F.2d 264, certiorari denied 295 U.S. 748, 55 S.Ct. 826, 79 L.Ed. 1693. These are product—not process—claims and both the "New Hue" and the "New Solila" product, howsoever they were made, must be held to infringe each of the claims in suit, if—contrary to my holding—these claims be valid.

### Patent No. 2,202,712.

In the situation disclosed in the Findings, Par. 18, the defendant by brief asks that an adjudication be entered on the issue of the validity of claim 5 of this patent.

I apprehend, however, that upon the plaintiffs' withdrawal of the charge of infringement no case or controversy within Art. III, Sec. 2 of the Constitution remains, and that the only action open to the court is to order a dismissal as to this patent. The doctrine of Cover v. Schwartz, 2 Cir., 133 F.2d 541, certiorari denied 319 U.S. 748, 63 S.Ct. 1158, 87 L.Ed. 1703, is applicable to the situation here. Space does not permit a discussion of the ramifications of this doctrine discussed in Electrical Fittings Corporation v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263; Katz v. Horni Signal Mfg. Corporation, 2 Cir., 145 F.2d 961; Hale v. General Motors Corporation, 1 Cir., 147 F.2d 383, 388; Krasnow v. Sacks & Perry, D.C., 58 F.Supp. 828; Barnes Co. v. International Harvester Co., D.C., 51 F.Supp. 254, 268; Note 52 Yale L.J. 909.

I come therefore to the following Conclusions of Law.

**A.**

1. Claims 1, 2, 3, 5, 6, 9 and 10 of Patent No. 2,300,305, even if valid have not been infringed.

2. Said claims are invalid for indefiniteness.

3. Said claims are invalid for want of patentable invention.

4. Said claims are not invalid by reason of a prior use by the patentee or others.

**B.**

1. Claims 8 and 9 of Patent No. 2,202,713, if valid, have been infringed by the defendant.

2. Said claims are invalid for want of patentable invention.

3. Said claims are not invalid by reason of a prior use by the patentee or others.

**C.**

1. As to Patent No. 2,230,164, by stipulation of the parties the complaint should be dismissed with prejudice.

**D.**

1. As to Patent No. 2,202,712, by reason of the plaintiffs' withdrawal of· their charge that claim 5 has been infringed the complaint should be dismissed with prejudice and the court is without power to pass upon the validity of said claim.

**E.**

The defendant is entitled to a decree of dismissal, with costs.

A decree in accordance with the foregoing may be submitted for entry, on notice unless notice be waived.