**HUGHES AIRCRAFT COMPANY**

v.

**GENERAL INSTRUMENT COR-
PORATION.**

Civ. A. No. 3095.

United States District Court
D. Rhode Island.

July 19, 1967.

962

Dugald S. McDougall, Chicago, Ill., Benjamin A. Smith, Providence, R. I., for plaintiff.

Harold James, New York City, Herman J. Aisenberg, Providence, R. I., for defendant.

## OPINION

PETTINE, District Judge.

This is an action for patent infringement and the court has jurisdiction over the parties and the subject matter. Two patents are involved, to wit:

a) U.S. Patent No. 2,694,168 entitled, "Glass-Sealed Semiconductor Crystal Device," issued November 9, 1954 to the plaintiff as assignee of Harper Q. North and Justice N. Carman, Jr. (hereinafter referred to as "the North patent") and

b) U.S. Patent No. 2,742,383 entitled, "Germanium Junction-Type Semiconductor Devices," issued April 17, 1956 to the plaintiff as assignee of Sanford H. Barnes and Justice N. Carman, Jr. (hereinafter called "the Barnes patent").

Both patents have been the sole property of the plaintiff, Hughes Aircraft Company, at all times since their respective dates of grant.

The plaintiff, Hughes Aircraft Company, is a Delaware corporation, its principal place of business being at Culver City, California. The defendant is a New Jersey corporation having an office and factory at Woonsocket in the District of Rhode Island whereat it is alleged the acts of infringement were committed and the venue is hence properly laid in this District.

The plaintiff charges defendant with having infringed both the North patent and the Barnes patent by manufacturing and selling, without license from plaintiff, semiconductor devices embodying the respective inventions of those patents. Specifically, the plaintiff charges infringement of claims 60 and 61 of the North patent and of claims 2, 4, 10 and 11 of the Barnes patent. Defendant admits that it has infringed claims of the North patent, if they are valid; defendant denies infringement of any of the claims of the Barnes patent.

In addition to denying infringement of the Barnes patent, defendant has pleaded, with respect to both patents in suit the affirmative defenses of patent invalidity and laches and estoppel.

This court feels some general statements as to the basic principles relating to these patents is necessary in order to better understand the inventions in question.

The two types of semiconductor devices involved in this case are "diodes" and "transistors."

There is no controversy concerning the testimony of the plaintiff's witness, Dr. Dietrich A. Jenny, who described these as being semiconductor devices which make use of certain special electrical properties possessed by a class of chemical elements and compounds which are called "semiconductors." - A semiconductor has electrical conductivity intermediate between that of metals such as silver and copper on the one hand and that of insulating materials on the other.

The most commonly used semiconductors are the elements germanium and silicon and generally speaking the case at bar involves a small crystal, pure germanium or silicon, into which there has been intentionally introduced impurities. If the impurity so introduced is of a class of elements known as "donor impurities" (antimony and arsenic being examples) it will result in an N-type semiconductor; if it is of the elements called "acceptor impurities" (aluminum and indium being examples) it will result in a P-type semiconductor. Each of these types conduct electricity in different ways and are much better than the pure semiconductor crystals.

N-type and P-type semiconductors can be made to conduct current readily in one direction while strongly resisting current flow in the opposite direction and this is known as "rectification" which is a useful property, having wide application in electrical circuits. Rectification action may be obtained by bringing the sharp point of a metal (sometimes called a "catwhisker") into contact with the crystal surface. In simplest terms, those of us who have passed the half century mark may well remember doing this in the crystal sets we made as children. Today, it is called "point-contact diode."

Another way of fashioning a rectifier from N-type or P-type semiconductor crystal is to convert a portion of the crystal over to the opposite conductivity type—that is, to form a region of P-type material in a crystal which is otherwise N-type, or vice-versa. When this is done, the boundary between the P-type and the N-type region acts as a rectifier. This is known in the art as a "P-N junction."

The diode is a simple semiconductor rectifier having two terminals to permit their being connected into an electrical circuit. In the case of a point contact diode, one of the terminal leads is connected to the catwhisker and the other to the body of the crystal; in the case of a P-N junction diode, one of the terminal leads is connected to the P-type region of the crystal and the other to the N-type region of the crystal.

The transistor is a more complicated type of semiconductor device, in which two or more rectifying regions are provided within a single semiconductor crystal. This may be done by providing more than one P-N junction. Transistors formed from an N-type crystal having two different P-type regions therein are known as P-N-P transistors; alternatively, transistors fashioned from a P-type crystal having two separate N-type regions are known as N-P-N transistors. Both of these types have important applications and are widely used.

In viewing some of the exhibits, it can readily be seen that generally a transistor has three external terminals; one terminal being connected to the base crystal and the other two being respectively connected to the two regions of conductivity type opposite to that of the base crystal.

There is no question that early in the history of the art, successful P-N-P transistors of the alloy-junction type were developed and marketed. However, this controversy arises as to the N-P-N transistors which the plaintiff contends did not come into practical commercial being until some several years after the P-N-P type.

With this background, the court will now focus its attention to the North patent No. 2,694,168.

NORTH PATENT

The North patent discloses and claims glass-sealed semiconductor devices and methods for making such devices. It contains 61 claims and of these, the defendant is charged with infringement of claims 60 and 61. The defendant has manufactured in commercial quantities glass-sealed semiconductor diodes that respond to the description in claims 60 and 61 and admits that those claims, if valid, have been infringed. Claims 60 and 61 of the North patent here in suit are alike save for minor differences in language.

Claim 60 of the North patent reads as follows:

"60. A semiconductor device comprising

a vitreous envelope having an inner chamber and including an elongated tubular body section of substantially uniform external cross section at right angles to the direction of elongation thereof and having a maximum cross sectional dimension at right angles to said direction of elongation of the order of one tenth inch,

and first and second solid massive end sections,

at least the major portion, lengthwise of each of said end sections constituting a solid vitreous member having a cross section at right angles to said direction of elongation substantially equal to said external cross section of said tubular body section;

first and second solid, one piece ductile lead wires extending through said first and second end sections, respectively, along the median line, substantially, in the direction of elongation of said body section and hermetically and directly sealed to said end sections,

each of said lead wires having a first end terminating within said chamber,

a semiconductor element affixed to, supported by and electrically connected to the first end of said first lead wire; and a resilient element affixed to and supported by the first end of said second lead wire and contacting said semiconductor element;

the length of the seal between each lead wire and the respective end section being at least 1.5 times the maximum cross sectional dimension of the lead wire,

and the transverse outside dimension of the said major portion of each of said end sections being at least of the order of five times the maximum cross sectional dimension of the corresponding lead wire."

The merits of hermetically sealing a semiconductor diode in a glass housing are not in dispute.

There was a need for hermetically sealing a semiconductor diode in a glass housing because of the intrinsically delicate nature of semiconductor devices. They are subject to deterioration due to moisture in even minute amounts and effective gas tight sealing is therefore essential for stable operation and long life.

There is no need to point out specifically the testimony describing the difficulty in designing an effective glass-sealed housing because of complications introduced by expansion and contraction under temperature changes of the glass housing and the metal parts of the device. This court finds it uncontradicted; it also finds uncontradicted the testimony showing how semiconductor crystals may be damaged and ruined by the temperatures required for sealing glass to metal, for a successful glass-housed, hermetically sealed diode must be capable of final sealing without subjection of the semiconductor crystal to excessive temperature.

The North patent is a diode or rectifier. The electrically active elements are a germanium crystal to one surface of which a lead is ohmically connected, a pointed lead being resiliently pressed against the opposite surface of the crystal. These active elements are completely surrounded by a glass envelope, the leads extending out through and being hermetically sealed to the glass envelope.

In the North patent, figure 14 (Exhibit 20–F), it can be seen that all surfaces except the upper surface of the germanium crystal are embedded in and completely surrounded by a glass bead. The upper surface of the germanium crystal is exposed and the non-pointed leads extend through the bead to make electrical connection with the lower surface of the crystal inside the bead. This glass bead is sealed to and integrated with the tubular glass envelope. The germanium crystal is completely in lateral contact with the glass. Its upper surface is exposed to the inner chamber defined within the glass envelope and received within that inner chamber is the pointed lead.

These were manufactured and sold by the plaintiff in the second quarter of 1951. However, the plaintiff changed the construction to one in which the germanium crystal was no longer in lateral contact with and embedded in a glass bead (Exhibit 20–H), but instead was located within the inner chamber of the glass envelope.

This court finds there is little need to dwell on the success enjoyed by the plaintiff's diode. The testimony of Mr. David F. Doody points this out. In this vain, some pertinent testimony of Norman J. Egli showed that the commercial sales operation started in January 1953 and that by the end of the first quarter of 1954, Hughes Aircraft Company was established as a major source for IBM diodes. This is significant since the IBM Corporation was considered the largest user of semiconductor diodes.

This court does not want to extensively reiterate the testimony, but it was impressed with Mr. John B. Little's statements, who is the Director of Advanced Engineering on the corporate staff of IBM. As an authority who wrote the chapter entitled, "Encapsulation" published in the "Handbook of Semiconduc-

tor Electronics," he said the Hughes diode represented a significant encapsulation development. Throughout his deposition, this testimony remained unshaken.

There is no telling testimony by the defense disputing the merit of the Hughes diode; it unquestionably satisfied a long felt need and continues to do so. The success of the diode was almost immediate as the plaintiff's witness Mr. Norman J. Egli stated he started work in January 1953; he "came East to set up sales operations with 2000 sample Hughes diodes, no office, no facilities and no salesmen." Yet by the first quarter of 1954, his "primary problem was getting enough units rather than meeting competition."

The very nature of the defendant's infringement establishes its great commercial value.

This court sees the defenses asserted against the North patent to be as follows:

1. Claims 60 and 61 do not find support in the patent disclosure.

2. The subject matter of claims 60 and 61 were anticipated by certain glass-packaged diodes made by hand at the Sylvania laboratories in the late 1940's.

3. The subject matter of North claims 60 and 61 was obvious at the time of North's work in view of published prior art.

4. The subject matter of claims 60 and 61 were first claimed in the North patent application more than one year after diodes embodying the invention had been sold.

5. The plaintiff's right of action for its infringement is barred by laches and estoppel.

The defendant's position is that claims 60 and 61 of the North patent were drawn specifically to the so-called Hughes commercial diode. That is the one it is presently making as shown in Exhibit 20-M and that this differs from the one shown in the patent.

The defendant argues forcefully that the claims in question must have support in the specifications of the patent; that in the case at bar this is so lacking as to be fatal to the plaintiff's position. He in no way disputes that the claims do read on the so-called, "Hughes commercial diode" (Exhibit 20-H). To reiterate, his argument is they do not find support in the patent disclosure. In other words, the defendant argues the plaintiff shows one thing but claims something different; something that is not shown.

It is obvious the defendant is attempting to prove that by 1954 the "Hughes commercial diode" had been developed and placed on the market and that the plaintiff's patent attorney, in a frantic effort to protect his client, drew up claims 60 and 61 so that they would read on the "Hughes commercial diode" (Exhibit 20-H) and then persuaded the patent office to allow them. The record shows that claims 60 and 61 were first made during the prosecution of the North patent on July 27, 1954 as application claims 105 and 106 and represented revisions of application claims 102 and 103 first made March 9, 1954. The defendant argues that this was fatal, for what he drew up no longer described or read on what was shown in the patent.

The defendant further argues that claims 60 and 61 inserted something entirely new and that this was fatal because it was in 1954 which was not within one year of the date of first sale which was in 1952. He contends by reason of the patent statute they are therefore invalid.

The defendant specifically points to the following limitations in the claims (first presented in the North case on March 9, 1954 when claims 100–102 were added):

a) The tubular body has *maximum* cross sectional dimension at right angles to said direction of elongation *of the order of* $\frac{1}{10}$ inch.

b) One-piece lead wires *each* having a first *end terminating within the chamber* defined by the vitreous envelope.

c) A semiconductor element *supported by said first end of one of said lead wires*.

d) The length of seal between each lead wire and the respective end section of the envelope is *at least* 1.5 times the maximum cross sectional dimension of the lead wire.

e) The transverse outside dimension of the said major portion of each of said end sections being *at least on the order of* 5 times the maximum cross sectional dimension of the corresponding lead wire.

The main support for the defendant's position must be found in the testimony of Professor Lloyd P. Hunter.

This court need not dwell on a) above, for it finds the defendant's own witness did not support the defendant's contention in this regard. Though he testified he could find nothing in the patent to support the statement in the claim that the cross sectional dimension in question is a *maximum* as distinguished from an *exemplary* dimension, he did testify the reading in claim 60 "of the order of one tenth inch" did find support in the patent. The court reads this dimension in direct relation to the word "maximum" and finds that the Professor's admission destroys the burden of proof the defendant must carry.

As to b) and c) above, the answers may be found in the direct and cross examination of the witness, Professor Hunter. In direct examination, he specifically stated in answer to the question whether he found a one piece lead wire, "I have not found such a one piece lead wire in the specifications."

The witness testified that the specifications dealt only with a two piece lead wire and further they did not have a first end terminating within the chamber. As to both of these points, there was substantial explanation by the Professor. However, this court found pronounced weakness of this testimony in the cross examination. The court must focus its attention to element 12 in figure 14. First considering this alone, the witness

admitted that this satisfied the claim of a one piece ductile lead wire and was sufficient to have a useable device.

In addition, one need not be a scientist to see the fabrication of elements 10 and 12. One end is copper and the other is dumet which are both welded together end to end.

This court finds it is unrealistic and illogical to argue that after fabrication they do not constitute a one piece structure.

The defendant contends the lead wire element 10 terminates within the vitreous envelope instead of within the chamber because (note Exhibit 20–F enlarged version of figure 14) the material referred to as silver paste, " * * * after the fabrication of the diode is complete, is as much a glass as any other part of the envelope, and the fact that it contains silver particles which turn each other in order to provide an electrical conductivity does not exclude it as part of the envelope, that is my opinion." (T 1413–Hunter) This witness attempts buttressing his testimony by pointing out that the patent drawing cross hatches this area as the remainder of the glass envelope.

The qualifications of Professor Hunter are most impressive but he is still just an expert whose testimony this court can accept or reject.

In its most liberal approach, this court cannot accept this opinion, for it is destroyed by some very simple propositions readily understandable to the lay and scientific personnel alike. If this is glass to be considered as the rest of the glass envelope, how does it conduct electricity? Professor North, the inventor, was not reciting any earth shaking scientific phenomenon when he said in substance, as to this point, he could not find himself able to regard a material such as glass a conductor of electricity. There was extensive cross examination on this point which this court feels at best merely established an argument without approaching the required area of proof.

Once it is established that the silver paste in question is not glass and part

of the envelope, it can be agreed beyond doubt that the lead wire does in fact terminate within the chamber that is defined by the glass house. This being so, the semiconductor element is supported by said first end of said lead wires.

This court, without hesitancy, finds this as an established fact.

Item d) above concerns itself with the seal length. The defendant contends that there are no dimensions set forth in the specifications which show the length of the seal as set forth in the claim reading,

"the length of the seal between each lead wire and the respective end section being at least 1.5 times the maximum cross sectional dimension of the lead wire."

Professor Hunter testified that he found no verbal description in the specifications describing any relationship between the length of the seal, between the lead wire and the cross sectional dimension of the lead wire. The witness was quite categorical in saying there was no indication in the specifications of any significance to such a relationship; nothing in the specification supported the language "at least 1.5 times"; found nothing in the specification which suggests the number 1.5 as a specific number in that connection; found nothing in the specification indicating that there is any desired minimum relationship between the length of the seal and the cross sectional dimension of the lead wire.

This court has often agreed that trial work is the surgery of the law. The examination of Professor Hunter by Mr. McDougall, as to the point in question, shows that the mastery of this surgery lies in cross examination.

If the direct examination of this witness is to have any force at all, it must be to prove that the patent fails in that it does not disclose a seal as described which is equal or greater than 1.5 times the diameter of the lead.

The witness's own admission negates entirely the defendant's position in this regard. One need only to read the final culminating question in cross examination (T 1751).

"Q. The patent does disclose to you does it not, a seal between the end sections of the diode and the lead wires which is equal or greater than 1½ times the diameter of the lead?"

"A. Equal or greater than, yes sir."

However else it may be argued, this is the very essence and meaning and purpose of the patent claim in this regard.

In e) above, the defendant does not attack the dimensions as such but rather contends that there is no minimal or maximal relationship, a relationship "on the order of" a given value or that there was any significance in the relationship between these dimensions.

The court does not find this to be so.

In other words, the defendant is saying in his attack on the dimensions of the patent that ratio alone in respect to the size of the glass cylinder in relation to the size of the lead wire was not enough to insure a strong dependable product.

Here again, this court finds the facts to be as admitted on cross examination by the defendant's main witness, Professor Lloyd Hunter who stated that the North patent adequately defines an operative ratio by first giving the absolute size of either the lead wire or the glass body and then stating it in ratio of diameters. This is found in the disclosure in the specifications and the claims and can be seen by a reading of the specifications and the claims together with the pertinent figures. In the light of the testimony of Dr. Jenny and cross examination of Professor Hunter, this court finds that the dimensional relationships recited in claims 60 and 61 are critical and contribute in a very significant degree to the commercial success of the product. Consideration of all the features of the North patent results in the conclusion, and which this court finds, that it embodies patentable novelty.

This court finds that the defendant has failed to carry the burden of proving the North patent invalid on the theory that claims 60 and 61 have no support in the specifications of the patent.

The testimony of Dr. Jenny, and the patent itself is clear and convincing.

Certainly the testimony shows the dimensional limitations are critical and do define the invention. Professor Hunter has disagreed and yet in cross examination, as hereinabove described, he conceded in this regard, vital points at issue.

The claims, specifications and drawings show and this court finds:

a) That the dimensional recitations in claims 60 and 61 in suit are supported by the patent disclosure. The use of drawings in conjunction with the descriptive text is supported by such cases as National Latex Products Company v. Sun Rubber Company (6 Cir. 1960) 274 F.2d 224, 230; Permutit Co. v. Graver Corporation (1931) 284 U.S. 52, 60, 52 S.Ct. 53, 76 L.Ed. 163.

The fact that the present product, Exhibit 20–H, is different in some respects from the description in the patent, it is, nevertheless, the same product.

The court specifically finds this as a fact. The claims read directly on Exhibits 20–F, 20–G, 20–H.

This court finds the present-day commercial diodes of both parties embody the key features of the original diode disclosed in the specification and drawings of the North patent, differing therefrom only in minor details. The language of claims 60 and 61 reads aptly on both the old and new constructions. Neither claim 60 nor claim 61 defines the structure of the electrical components except in the most general terms, equally applicable to both the old and the new.

There still remains, however, the determination whether the patent is invalid by reason of prior art and laches.

In urging invalidity by reason of prior art, the defendant points to a number of earlier patents all of which show glass enclosed semiconductors. This is beyond debate. However, the plaintiff urges that none of these satisfied the numerous requirements of the plaintiff's structure, namely, gas-tight sealing so as to be moisture free. To accomplish this, the plaintiff's invention developed a successful glass-housed, hermetically sealed diode capable of final sealing without

subjecting the semiconductor crystal to excessive temperature.

In pressing his position, the defendant placed much emphasis on the Sylvania all glass diode.

The record shows that Sylvania did develop a diode having a true hermetic seal in the late 1940's, but it was not an all-glass design. This court found one of its principle features to be a hollow glass housing sealed at its ends to cylinders of Kovar metal. The electrical components of the diode were mounted on nickel rods, introduced into the glass shell through the Kovar metal end members, and sealed in place by metal to metal solder seals.

This diode did have certain success being used by IBM Corporation but were largely supplanted by plaintiff's diodes (embodying the invention of the North patent). These were much larger in size than the plaintiff's diodes; they were less rugged and would often fail in service because minute amounts of solder flux would penetrate into the housing, contaminate the semiconductor diode and shorten its life. In the late 1950's Sylvania itself began selling germanium diodes in all glass packages which this court feels are identical with those of the plaintiff, and they have replaced the glass and metal diodes as the dominant sellers in Sylvania's line.

This court finds there are such marked differences between the Hughes and the glass and metal Sylvania diode that it cannot be considered prior art showing anticipation of the subject matter of claims 60 and 61 or rendering the subject matter of such claims obvious at the time the North invention was made.

The nickel rods in the Sylvania diode (Exhibit 20–D) are stiffer. They were primarily for clipping into place rather than being soldered. They are not comparable in flexibility to the dumet leads of the Hughes diode.

The semiconductor crystals in the diodes under discussion are protected from heat to a great extent through the use of beaded leads. These beads are sealed to the leads before assembling of

the crystal and pointed lead which are subsequently sealed to the glass envelope and so complete the hermetical sealing of the inner chamber of the device with the semiconductor crystal inside.

The Hughes diode (Exhibit 20–F) and the so-called commercial Hughes diode and the Sylvania diode differ in this respect, for the hole in the Hughes diode bead is to accommodate the dumet wire upon sealing the bead around the wire. It passes entirely through the bead. The beads in the Hughes structure do not either before or after fabrication of the device contain any semiconductor elements; they do not contain catwhiskers. All of this just isn't true of the Sylvania diode. In fact, the opening in the Sylvania diode contains both a crystal and catwhisker.

The Hughes diode makes reference to objectives of the invention which do not bring in or involve the idea of housing the crystal in glass. The court refers to this because the defense contends the teachings of Dr. North include surrounding the sides of the crystal with glass.

The court finds the Hughes diodes objectives have nothing to do with the side wall of glass around the crystal. In fact, claims 60 and 61 say nothing about the side wall of glass around the crystal. The objectives of the patent as recited at line 80 in column 2 over to line 4 of column 3 does not bring in or involve the idea of housing the crystal in glass. It reads,

"It is an additional object of this invention to produce electronic crystal devices of exceptionally small size and mounted in glass envelopes filled with air or inert gas, the produced devices having practically negligible stray capacitances, being completely impervious to moisture and therefor having long useful life."

These objectives are fully satisfied by the current commercial Hughes diode as identified in Exhibit 20–H.

One need not dwell on the fact that the Sylvania diode does not satisfy the direct vitreous, gas-tight seal between the envelope and the electrodes connected to the crystal. This can readily be seen by noting the seal between the Kovar tubelet on each side and the nickel rod. The nickel rods are soldered to the Kovar. Herein lies a telling distinction.

The court also wishes to allude to the defendant's contentions concerning the ability of the Hughes diode to endure environmental temperatures of 500 degrees centigrade.

This court further finds the 500 degrees centigrade temperature recitation in the specifications is not fatal, for the patent (Exhibit 20–F) can function in normal 500 degree centigrade temperatures because of the substance which is used to attach the semiconductor element to the lead wire. This structure disclosed in the Hughes diode melts above 500 degrees centigrade. However, there is nothing in claims 60 or 61 that restricts the adhesive to be used. The language is broad enough to include other forms of adhesive. Certainly the language "a semiconductor element affixed to, supported by and electrically connected to the first end of said lead wire," is broad enough to include any kind of adhesive.

Before leaving this point, the court is not unmindful of Dr. Jenny's testimony that the patent in question does not disclose enough to construct all of the semiconductor elements of the Hughes commercial diode.

Obviously, the semiconductor elements in the Hughes commercial diode (Exhibit 20–H) incorporated art developed subsequent to the patent application.

However, the claims of the patent are not so restricted that the development falls outside the scope of the claim.

This court finds the claims in suit say nothing about the innards of the device except to describe them as semiconductor element and a resilient device, etc. The court finds the claim is couched in language which is broad enough in scope to embrace the commercial diode.

As to prior art, the defendant referred to a number of them, namely:

1) *The British patent*—was used by the defendant to show that the specification of ratios in the claims are not critical. The defendant contends there is no one correct ratio. The court is not impressed by this because this is not the criteria by which this invention is distinguished from prior art.

2) *The Collins patent*—it is significant to note that structurally it is utterly lacking in shock resistance; never used commercially; it does not have beaded leads with a final seal made on a glass to glass basis.

3) *Gates patent*—this court finds that though certain claims of the Hughes diode read on this patent, it cannot be considered prior art which anticipates the diode in question nor does it have obviousness.

It is a different construction—which was never made commercially. It is a two piece construction with the sealing region made at the opposite end of the diode from the crystal. This court can and does not find it anticipates the Hughes diode nor can it be said it is obvious. The concave construction of the Gates patent, indeed, teach a markedly different approach than the Hughes diode.

4) *Swanson*—the defense read certain claims on this patent but this court does not find that it is in any different position than the other patents above recited. These have been read from the Swanson patent which discloses a high pressure gas metal like vapor lamp using quartz gas for its ultra violet transmission properties. The operating temperature is in the incandescent range and so above the melting point of ordinary glass.

This court finds neither obviousness or anticipation from this patent of so different a device from the one in question. The same is true of the Fitchett patent.

It is true that Gates, Fitchett and Collins patents disclose glass bodied diodes in which at one end or both ends of the glass envelope, direct glass to metal lead seals are made and it is true a glass enclosed semiconductor device was not new when North made his invention. However, the North patent is far different. Structurally, it made possible a glass-housed, hermetically sealed diode capable of final sealing without subjection of the semiconductor crystal to excessive temperature. This was a difficult problem because of:

1. Expansion and contraction, under temperature changes of the glass housing and the metal parts of the device.

2. Protection of the crystal from damage by the temperatures required for sealing glass to metal.

a) Here we have a glass to glass sealing.

The testimony clearly shows and the court so finds that prior to the North patent, all attempts to accomplish a glass housed diode that was small, hermetically sealed as a protection against moisture even in minute amounts, accomplished so as not to damage, by heat, the semiconductor crystal, failed. The Sylvania diode that had been developed did not embody these features. The strand of truth with all its force is found in the fact the defendant has copied the Hughes diode. This certainly attests to its commercial value. In viewing and examining the prior art. It may be argued that the Hughes diode does not reflect much of a change. However, this court finds it was change that made the difference between success and failure.

The defendant's attempts to show anticipation have fallen far short of the required proof. The whole force of this argument rested on the Sylvania diode, certain ones having been made in the Sylvania laboratories in the late 1940's.

The Sylvania abandoned experiments cannot be used as "prior art" under 35 U.S.C. 102(g) for the work in question was "concealed", "suppressed" and "abandoned." An analysis of the evidence shows that it is an audacious

argument which the defendant presents in relying on the Casellini and Gates experiments.

1) Casellini's handmade diodes were literally thrown away—no specimen even remained in existence for defendant's counsel to put in the record.

2) Gates was the same except for two specimens:

  a) One with "innards" which he "dug out" from his desk drawer and posted in his notebook with scotch tape after he had seen samples of the Hughes commercial diode.

3) None of these experimental diodes were ever used for anything—neither the experimental diodes nor the notebook entries concerning them were ever seen by anyone outside the Sylvania laboratory. The notebook containing the only record of Gates' experimental work was retained in his exclusive possession and kept in a locked filing cabinet from the time the work was done until it was exhumed at the request of defendant's counsel.

The court finds this constituted the ultimate in concealment and suppression. Emerson & J. H. Emerson Co. v. National Cylinder Gas Company, 146 F.Supp. 581, 584, aff'd (1 Cir. 1958) 251 F.2d 152.

As for abandonment, one need only point out, as the plaintiff argues, Sylvania's own witnesses acknowledged that the all glass diode project was relegated to the locked filing cabinets and the metal ended diode developed instead as a conscious management decision.

This court finds that defendant's citation of Corona Cord Tire Company v. Dovan Chemical Corporation (1928) 276 U.S. 358, 382, 48 S.Ct. 380, 72 L.Ed. 610 is far different from the case in suit. In said case, there was no abandonment—there was a public sale and disclosure of his work read before the American Chemical Society.

The statutory language "known or used by others in this country" (35 U.S.Code, Sec. 102(a)) *means publicly known.* (See the official Re-

visers Note to Sec. 102, 35 U.S.C.A.; Sec. 102, page 446.) The right to a patent is not affected by abandoned experiments uncommunicated to the public, especially where the circumstances show that the experimenter did not appreciate the virtues and advantages of the invention. Gillman, et al. v. Stern, et al. (2 Cir. 1940) 114 F.2d 28, 31.

"Such a use is clearly not a 'public' one, and such an inventor is not a 'first inventor.' In Gayler v. Wilder, 10 How. 477, 481, 497, 13 L.Ed. 504, the question was whether the condition—which has always been in the statute—that the patentee must be the 'first and original inventor' was defeated by anyone who had earlier conceived the same invention, or only by one who had also in some way made public his results. A majority of the court held that only the second would defeat a patent on the ground that what had not in fact enriched the art, should not count; and the doctrine is now well fixed. Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651. Just as a secret use is not a 'public use,' so a secret inventor is not a 'first inventor.' "

North used beaded leads fused into the ends of a tubular glass envelope and this resulted in the great strength and ability to withstand the stresses of lead bending and low-temperature glass to glass final sealing. As has been stated, beaded leads had been known in the fabrication of vacuum tubes, but it was the North patent that went beyond the laboratory.

As whether the invention protected by the plaintiff's patent were "obvious," at the time of the invention, to persons of ordinary skill in the art (35 U.S.Code Sec. 103) the legal standards have been clearly established by the cases. The burden of proof rests on the infringer who would escape liability by pleading invalidity.

"Through all the verbal variances * * * there runs this common core of thought and truth, that one otherwise an infringer who assails the va-

lidity of a patent fair upon its face bears a heavy burden of persuasion, and fails unless his evidence has more than dubious preponderance." Radio Corporation of America, et al. v. Radio Engineering Laboratories, Inc. (1934) 293 U.S. 1, 7–8, 54 S.Ct. 752, 755, 78 L.Ed. 1453. See also Mumm v. Jacob E. Decker & Sons, 1937, 301 U.S. 168 at 171, 57 S.Ct. 675, 676, 81 L.Ed. 983.

"The issue of the patent is enough to show, until the contrary appears, that all the conditions under which a discovery is patentable in accordance with the statutes have been met. Hence, the burden of proving want of novelty is upon him who avers it. Walker on Patents, § 116. Not only is the burden to make good this defense upon the party setting it up, but his burden is a heavy one, as it has been held that *"every reasonable doubt should be resolved against him."* " (emphasis added)

In November of 1966, the defendant was granted leave to amend its answer to set up laches and estoppel as an additional defense.

Actual written notice of infringement of the North patent was given to the defendant on December 28, 1961 which was the date of the defendant's first knowledge of the North patent. Both Radio Receptor Company and General Transistor Corporation, defendant's predecessors in the semiconductor business, began manufacturing infringing diodes without knowledge any patent was involved. Suit for infringement was filed in this court on November 27, 1962 after negotiations throughout the major part of 1962 had ended in an impasse. (C.A. No. 3042 later replaced by the present action for procedural reasons.) Defendant's infringement of the North patent commenced when it acquired Radio Receptor Company in 1957. It is not so that defendant commenced infringing North patent in 1954. The law does not permit defendant to "tack on" a period of infringement by another party to bolster a claim of alleged laches—this is a personal defense. Pierce v. American Communications Co., Inc., et al., D.C., 111 F.Supp. 181, 190.

It appears that in December 1961 when defendant received plaintiff's notice of infringement, it had spent between $400,-000 and $500,000 on equipment used for manufacturing the infringing diodes. This cannot be considered by the court, for such expenditures were not made in reliance on any action or inaction by the plaintiff; defendant did not even know of plaintiff's patent at that time. Furthermore, this same equipment defendant uses for manufacturing infringing diodes is also used to make non-infringing, stud package glass diodes of the type exemplified by defendant's Exhibit X–2.

The total interval between plaintiff's first knowledge of infringement by defendant and active assertion of plaintiff's rights was in both instances less than six years.

There is no factual basis for a judgment of either laches or estoppel—such defenses must be rejected. See B. F. Sturtevant Co. v. Massachusetts Hair & Felt Co. (1 Cir. 1941) 122 F.2d 900, 911; France Mfg. Co. v. Jefferson Electric Co. (6 Cir. 1939) 106 F.2d 605, 609.

The further argument of the defendant that claims 60 and 61 inserted something new and that this was fatal because it was in 1954 which was not within one year of the date of first sale which was in 1952, fails to consider applications 44, 46 and 48. These were drawn to the same subject matter and were introduced into the North application on March 17, 1951. As the plaintiff argues, patent claims 60 and 61 which were submitted in the North application during 1954, did not constitute initial claiming of subject matter previously unclaimed but merely narrower definition of subject matter originally disclosed in the specification and broadly claimed as early as 1951.

This contention of the defendant that claims 60 and 61 are invalid because filed too late is without legal basis. The defense argues it falls within the clear holding of Muncie Gear Works, Inc., et

al. v. Outboard Marine & Manufacturing Co. et al. (1942) 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171.

The application in said case related to an outboard motor. The claim held invalid concerned an anti-cavitation plate. This court's understanding of the case may be summarized as follows:

1) The original claims were limited— that is the original application did not disclose the invention. The issue involved an anti-cavitation plate which was never claimed as an invention in the history of the application. When the new claims were added, elements included in the previously submitted claims were omitted. In other words, the end result of the newly added claims was a device never before claimed as the patentee's invention.

The plaintiff's argument, as set forth in his brief, in this regard is conclusive. He deals a devastating blow to the whole contention of the defendant because it cannot be disputed that the narrow claims added in 1954 which ultimately matured into claims 60 and 61 of the patent, introduced dimensional limitations. The effect of adding those limitations to the claims was not to extend the claimed monopoly; it was on the contrary, to restrict it, in such a situation, it matters not when they were added.

"Nor do any of the remaining attacks on these two claims have merit. Under the doctrine of 'late claiming' as exemplified in such cases as Muncie Gear Works v. Outboard Marine & Mfg. Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942) *a supplemental claim adding new matter* (emphasis added) to a pending patent application is invalid where intervening use or sale of a device described in the supplemental claim occurred more than one year prior to the filing of that claim. 35 U.S.C.A. § 102(b). It is true that in this case the 090 plow had been in public use for nearly four years before Pursche supplemented his pending patent application with claim 27. But the scope of the invention

stated in several claims initially made in that application extended to and included the matter covered in claim 27. Claim 27 added nothing new to the application." Pursche v. Atlas Scraper Engineering Co. (9 Cir. 1962) 300 F. 2d 467, 476–477. See also National Latex Products Company v. Sun Rubber Company (6 Cir. 1960) 274 F.2d 224, 230–231; Binks Manufacturing Company v. Ransburg Electro-Coating Corporation (7 Cir. 1960) 281 F.2d 252, 257.

In Myerson et al. v. Dentists' Supply Co. of New York (S.D.N.Y., 1946) 66 F. Supp. 31, at 37, aff'd. (2 Cir. 1947) 159 F.2d 681, the court stated:

"The claims as finally issued stated not a different subject-matter of claimed invention, as in Muncie Gear Works v. Outboard Marine & Mfg. Co., 315 U.S. 759, 62 S.Ct. 865, * * * upon which the defendant relies, but merely a narrower exemplication of the same claimed invention. They are entitled to the 1936 filing date."

As a matter of law, the late-claiming contention of the defendant has no application and is without merit being founded on a factual basis that does not exist in this case.

The change accomplished by North which made his diode a success is evidence of its patentability. The argument that it does not reflect a great change over the prior art is of no avail.

Our own Court of Appeals stated in S. D. Warren Co. v. Nashua Gummed & Coated Paper Co. (1 Cir. 1953) 205 F.2d 602, 604–605:

"It is usually, if not indeed always, easy to discover a genesis somewhere for any patentee's contribution. A thought expressed here, a hint appearing there and a suggestion made somewhere else can always be found, after the event, and assembled to support the contention that what the patentee did was really nothing but what anyone else might do if so inclined. But if patents were to be held invalid on such reasoning few would survive. Even

the greatest invention of all time, the wheel, had, we are told, its prior art of unnumbered savages slipping on round stones. How many slipped before some bruised genius among them literally fell upon the principle of the roller, and how many more years, or centuries, passed before some succeeding genius, building upon the prior art of rollers, thought of a fixed pivot and invented the wheel, can only be surmised."

It certainly cannot be contradicted in this case that the Hughes commercial diode is the first device of its kind to achieve such commercial success.

"The courts may examine into the art to determine if the alleged discovery or invention has substantially advanced the art. If it has done so, there should be a liberal construction of the patent to secure to the inventor the reward which he deserves. This is especially true when for the first time there has been commercial success of the invention. Commercial success in itself is not sufficient to sustain a patent but it is evidence of its validity and in doubtful cases may be the deciding factor." Oliver United Filters, Inc. v. Silver (10 Cir. 1953) 206 F.2d 658, 663–664.

■ As to the North patent, this court concludes as a matter of law that the North patent in suit No. 2,694,168 has at all times since its issuance been the sole property of the plaintiff; and its claims 60 and 61 are good and valid in law.

The defendant, within the six years next prior to the filing of the complaint in Civil Action No. 3042 in this court and within six years next prior to the filing of the complaint in this action, has infringed claims 60 and 61 of U. S. Patent No. 2,694,168 by manufacturing, using and selling glass-sealed diodes embodying the invention covered and protected by such claims.

The defendant has failed to establish a basis in fact or law for its plea that the plaintiff's right of action against it with respect to said patent No. 2,694,168 are barred by laches and estoppel.

■ The plaintiff is entitled to recover from defendant its legal damages for the defendant's aforesaid acts of infringement occurring since December 28, 1961, the date on which the plaintiff gave the defendant a written notice of such infringement. Plaintiff is also entitled to recover from defendant its statutory costs incurred in the prosecution of this action. An accounting to determine the amount of such damages and costs is hereby ordered, its commencement, however, to await the conclusion of any appellate proceedings taken from the interlocutory judgment entered concurrently herewith, or until the expiration of the time for the taking of an appeal therefrom whichever shall last occur.

## BARNES PATENT

### FINDINGS OF FACT

In discussing this patent, the court, for the sake of continuity, may repeat certain matters hereinbefore recited.

The Barnes patent relates to a method for making an alloy junction and to semiconductor devices which embody such an alloy formed junction. The present action is directly concerned with those devices disclosing alloy junction N-P-N transistors.

Germanium in the form of a small crystal wafer or chip is utilized in such devices into which there is introduced so-called impurities. This is known in the art as "doping." Depending on the impurity used, the resulting germanium crystal will be either a "P-type" or an "N-type," both of which are better conductors of electricity than pure germanium though each do it in different ways and both can be made to conduct current readily in one direction while strongly resisting current flow in the opposite direction. This one way conductivity is rectification and is obtained by converting a portion of doped germanium crystal to the opposite conductivity type. When this is done, the boundary between the "P-type" and "N-type" regions acts

as a rectifier. In the art, it is known as "P-N junction."

A structure which is P-N-P is a transistor. It amplifies. For example, our public address systems have transistors so that by putting in a very small signal, it will be very loud as it comes out through a loudspeaker.

The diode contains a single P-N junction whereas a transistor makes use of a single semiconductor crystal with two P-N junctions in it. Whether it is P-N-P or N-P-N depends on the base crystal. For example, if the base crystal is P-type with two separate N-type regions, it is known as N-P-N. If the base crystal is N-type with two separate P-type regions, it is known as P-N-P.

Prior to the date of the Barnes patent, the process of making the P-N-P germanium transistor was known in the art. However, the testimony shows without contradiction that N-P-N transistors have utility and were desirable but accomplishing this proved to be quite a trick, for it could not be done by just following the old P-N-P procedures.

The evidence establishes that prior to the Barnes patent no commercially practicable means of making N-P-N alloy junction transistors was known. The making of an N-P-N transistor was more of a problem than just applying the same process for making a P-N-P transistor by doing the same thing with a different selection of materials.

For a P-N-P transistor an *acceptor* impurity—usually indium was placed on the face of a thin N-type germanium crystal. Heat was applied to make the indium molten and as it liquified, it began dissolving the germanium. The product was then cooled; most of the dissolved germanium in the liquid indium would re-deposit on the surface of the solid crystal. A drop in the temperature causes the indium to solidify, forming a little button of indium and germanium alloy on the germanium crystal surface, firmly bonded to the recrystallized region beneath.

As it will later be developed, one of the issues in the case in suit is whether or not this process forms an indentation. The plaintiff's argument is that some of the dissolved germanium stays in solution in the indium button and that this leaves an indentation in the germanium crystal surface, filled by the alloy button; that there is a reforming process of the original crystal and in doing this, the dissolved germanium atoms would carry back into the solid germanium crystals a substantial number of indium atoms, thus "doping" the region below the button and converting it to P-type. Hence, a P-N junction would be formed in the germanium crystal.

In making a transistor by the alloy junction process, the above described procedure was repeated on the other face of the germanium crystal, resulting in a pair of opposed P-N junctions with an N-type base crystal sandwiched therebetween. As has been stated, this process of making P-N-P germanium transistors was known in the art prior to the date of the Barnes patent.

The testimony establishes that attempts were made to produce N-P-N transistors by using the same process. However, these did not prove to be successful, for the impurity buttons would crack off or the base crystal would fracture on being cooled.

Research projects were launched with the goal of finding an effective method of making alloy junction N-P-N germanium transistors. These were, namely, by Sanford H. Barnes and Justice N. Carman, Jr., hereinafter referred to as "the Barnes Patent," which patent was assigned to the plaintiff and Dr. Dietrich A. Jenny at RCA laboratories.

Both the plaintiff and RCA filed patent applications. The plaintiff filed on August 9, 1952. RCA (this may be referred to hereinafter as Jenny's or RCA's Jenny patent) filed on September 16, 1952. Plaintiff's application matured into the Barnes patent in suit; RCA's Jenny patent was still pending in the Patent Office. RCA did not seek to either establish or interfere or assert prior invention by Jenny. Instead, RCA took a license from the plaintiff under the

Barnes patent, the consideration therefore having been a cash payment of $100,000.

The Barnes patent sets forth carrying out the alloy junction process with impurity buttons formed of a low-melting alloy containing among its ingredients a donor impurity and an element capable of dissolving germanium when the alloy is molten. Specific examples stated in the specification are 67% bismuth, 20% tin and 13% antimony; 80% bismuth and 20% antimony.

Plaintiff charges defendant with infringement of claims 2, 4, 10 and 11 of the Barnes patent. Illustrative of these claims are numbers 4 and 10 which read as follows:

"4. In a semiconductor translating device, the combination comprising:

a germanium specimen

having an indentation therein, said specimen having an N-type region immediately adjacent said indentation,

and a P-type region adjacent said N-type region;

and an alloy button

filling said indentation,

said alloy button being ohmically connected to said N-type region

and consisting of antimony germanium, and an element in which germanium is soluble when said alloy button is molten."

"10. A semiconductor transistor comprising:

a germanium specimen

having first and second N-type regions and

a P-type region separating said first and second regions;

first and second metallic buttons molecularly connected to said first and second regions, respectively,

each of said buttons being in ohmic contact with its associated N-type region

and including germanium and a donor impurity."

The defendant attacks the patent on a number of grounds, each of which will be discussed specifically by the court.

The evidence clearly establishes some very pertinent facts.

Dr. Jenny did develop an N-P-N alloy junction transistor in the course of his research work at RCA. This was in 1952 and he started by using straight antimony as the impurity substance in the alloy process. In his case, the alloy dot or the impurity dot ended up as lead and antimony. He further testified that his alloy satisfied the conditions taught by Barnes as the prerequisites to be looked for in a satisfactory alloy for this purpose. Namely,

a) An upper temperature limit—500 degrees centigrade;

b) A lower temperature limit for the melting point of the impurity metal—150 degrees centigrade;

c) Sufficient N-type impurity in the dot to accomplish the so-called doping task—to convert the P-type into N-type;

d) Sufficient germanium solubility—germanium must be dissolved in this impurity dot so that it can be redeposited together with the donor impurity.

The substance of this is that there isn't any question but what Dr. Jenny applied the same principles as taught in the Barnes patent.

Dr. Jenny's own testimony bears this out. He did prefer metal lead as the specific low melting germanium-wetting agent. However, he too worked with tin and in his patent application taught essentially the same requirements for the properties of the alloy as Barnes had previously set forth in his specification.

## INFRINGEMENT

The defendant's denial that it infringes the Barnes patent is based on the contentions that its products do not have *the "indentations" alluded in claims 2 and*

4 and *that the alloy buttons in its products do not contain germanium as demanded by all four of the Barnes claims in suit.* This requires resolving the question whether there is germanium present in the alloy buttons of the defendant's accused transistor. If this is so, there must of necessity be an indentation.

The defendant's position in this regard is shattered by the plaintiff's microprobe analysis which indicated presence of germanium in substantial proportions in defendant's alloy buttons. This position certainly was not helped by Professor Hunter who testified that during the period the P-N-P transistors are being processed at General Instrument there is germanium in the lead button; that it came from the wafer; that when the solidification process has been completed, there is still some germanium in the lead button; that it all got there by transport from the wafer; that the extent there is germanium in the button there is an indentation in like amount in the wafer; that it may not be observable but you could hypothesize such.

The lack of an indentation is one of the basic arguments relied on by the defendant for its claimed position of noninfringement. Certainly there is nothing in the Barnes claim which restricts it to an observable indentation.

It is inescapable that the defendant's alloy buttons contain germanium and it must follow its products do have indentations which causes this court to conclude and find that the plaintiff has, in the light of this testimony together with the evidence established through Dr. Jenny and the exhibits, sustained its burden of proof and has established that defendant's accused transistors are within the scope of claims 2, 4, 10 and 11 of the Barnes patent. Note plaintiff's Exhibit 2, column 7, lines 2–16; and Exhibit 9B.

■ Infringement is normally determined by comparing the claims of the patent with the product of the defendant. Where it appears that the defendant's product fully conforms to the definition of the invention set forth in the claims, " * * * infringement is made out and that is the end of it." Graver Tank & Mfg. Co., Inc., et al. v. Linde Air Products Co. (1950) 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097.

The defendant further argues that even if there is literal infringement of the claims, true infringement is nevertheless avoided. He states that although both defendant and Barnes reach the same end result—an N-P-N alloy junction transistor—they do so by using different materials and different conditions of treatment and their end products have different physical and chemical characteristics.

The defendant claims that under these circumstances, literal infringement of broadly drawn patent claims is of no avail and cites Westinghouse v. Boyden Power Brake Company (1898) 170 U.S. 537, 568–569, 18 S.Ct. 707, 722–723, 42 L.Ed. 1136.

This may be a provocative argument but this court does not feel it is applicable to the case in suit. It cannot be said that there is any essential difference in structure or mode of operation between the product disclosed in the patent and the defendant's transistors.

True the defendant uses lead but this fully satisfies the conditions for a suitable alloy that the Barnes specification prescribes, and they respond in every respect to the Barnes' claims.

■ Thus there is no quarrel with the quoted language from the above cited case used by the defendant,

" * * * the alleged infringer must have done something more than reach the same result. He must have reached it by substantially the same or similar means, or the rule that the function of a machine cannot be patented is of no practical value."

### INVALIDITY

The defendant asserts invalidity because they "include inoperative devices." The defendant alleges that transistors are "inoperative" when made with the bismuth antimony alloy mentioned in the

Barnes specification as a suitable composition for the impurity buttons. This allegation falls far short of the required proof. In fact, this court fails to find any evidence to this effect excepting testimony by Professor Hunter which certainly must be rejected for failure of proof.

"Q. Thank you. Now, I would like to address your attention to the testimony you gave in regard to the disclosure of the Barnes Patent in respect to the bismuth and antimony alloy.

On Page 1503 and 1504 the following statements were made by you. In response to an inquiry from the Court you said:

'And I was trying to point out in the patent itself it teaches that you can use a bismuth alloy, and that's one that doesn't work.'

'THE COURT: All right. So we can confine—

THE WITNESS: So when I answered you "yes" I had forgotten that that was part of it. And now I'm just putting that back in, saying that if you take all of the teachings you have one that doesn't give you a useful device and you have one that does. That's all I'm saying.

THE COURT: Thank you, Professor.

MR. JAMES: Which alloy are you referring to for the alloy button that does give you a useful device and which alloy are you referring to that does not give you a useful device?

THE WITNESS: Well, in the table in Column 8 at line 60 the first alloy, 67 percent bismuth-20 percent tin and 13 percent antimony will, I believe, give a useful device. The second alloy, 80 percent bismuth-20 percent antimony will not give a useful device because that alloy is too brittle and will tend to break off after being cooled from its melting point.

MR. JAMES: On what do you base that statement, that last statement?

THE WITNESS: Well, I base it partly on my experience with bismuth and antimony, both of which intrinsic"—that should undoubtedly by intrinsically—" are quite brittle, and I base it also on my examination of Barnes' note book which I have done previously, but not yet testified to, in which he had trouble with that alloy breaking off.

MR. JAMES: And the trouble that you say Barnes had, is that consistent or inconsistent with your experience with bismuth and antimony alloys?' And you answered that it was 'Consistent.'

Q. (Continuing) Now, Professor Hunter, I would like to inquire first what has been your own personal experience with bismuth and antimony alloys?

A. Well, my experience with bismuth antimony alloys, which is fairly extensive, did not have to do with semiconductors. Many years ago I worked with photo-tubes which are compounds of the element in the column that contains bismuth and antimony and the alkali metals, and each individual element of the first column, and in this case the fifth column of the periodic table, gives you a photocell of special characteristic and in an effort to get characteristics between the characteristic of antimony and cesium and bismuth and cesium, I made an alloy of bismuth and antimony prior to reacting it with a cesium to make the seal and I had quite a time with the hardness and brittleness of this alloy. This is what my experience has been.

Q. So, you have had no experience at all in carrying out the experiment that Barnes carried out in making P-N junctions with pellets formed of bismuth-antimony?

A. That is correct.

\* \* \* \* \* \*

Q. I want you to go through the Barnes notes, Professor Hunter, and tell the Court why, what, in these notes, you found as the basis for your testimony to this Court that alloy of bismuth and antimony in stated proportions is not operative in making P-N junctions.

A. Shall I read it?

Q. Yes, Please do. Give the Court the page number so he can follow you.

A. On Page 43 beginning at the top of the page, 'Several satisfactory P-N junctions were made. However, there was still a tendency for the buttons to fracture at interface upon adding slight amount of tin to the antimony bismuth alloy. There was no fracture or at least the button could not pried off.' This is what I had in mind when I said that he had trouble with fracturing of bismuth antimony alloys.

Q. Now, in the first place, the very sentence you read to the Court indicated that Barnes had made several P-N junctions with bismuth antimony alloys, didn't it?

A. Yes. I assume that 'satisfactory' meant electrical satisfactory.

Q. Have you heard Professor Jenny testify to the effect that he made some successful transistors N-P-N type with straight antimony?

A. Yes.

Q. (By Mr. McDougall) And I think both Dr. Jenny's testimony and the teaching of his patent application which is in evidence as a Defendant's exhibit is to the effect that the trouble with straight antimony is the fact that you get a low yield. You have a lot more failures than you have successes, is that right?

A. Yes, from the point of view of fracturing.

Q. Now do you have any reason to believe that this—by the way, while I am on the subject of Dr. Jenny's work, Dr. Jenny I think you testified yesterday did successfully fashion N-P-N transistors by the use of a lead antimony alloy and published a paper that talked the techniques to the industry, is that true?

A. That's right.

Q. Would it surprise you or maybe you remember, would it surprise you to know that Prof. Jenny had some failures during the course of his experimental work in which lead antimony failed to produce satisfactory transistors?

A. No, sir.

Q. That wouldn't surprise you at all?

A. That would not surprise me.

Q. It is a fact that experimental work frequently fails for reasons that are quite independent and separate from the basic merits of the material being used or the approach being tried out?

A. Yes, sir.

Q. And as far as your testimony in this record that the bismuth antimony is inoperative, you have nothing to go on except this one entry in Barnes' notes, Exhibit 4A to the effect that while he made several satisfactory P-N junctions with the bismuth antimony there was still a tendency for the buttons to break?

A. There is a couple other references but that is the one that stuck in my mind."

Defendant contends that:

a) It was conceded that claim 10 read directly and in all respects on an N-P-N alloy junctions transistor made using pure antimony as the impurity button, such transistors being admittedly not Barnes' invention;

b) Barnes concedes in his specification that this was prior art to him;

c) Claim 10, therefore, reads on the prior art and is clearly of no validity whatsoever.

This position must rest on the interpretation of claim 10. The relevant language reads, "first and second metallic buttons \* \* \* including germanium and a donor impurity." The plaintiff's position is abundantly clear and correct in asserting that read in the light of

Barnes' specification this language refers to the "donor alloy" defined in the specification as containing an ingredient operative to reduce the melting point of the alloy—that of pure antimony. To interpret the claim language as including an alloy consisting solely of antimony and germanium would be inconsistent with the patent's basic teaching that buttons of substantially pure antimony are unsatisfactory.

In further argument relative to invalidity, the defendant points out that the patent recites a maximum of 500 degrees centigrade beyond which germanium could not be heated without destroying its rectification properties. The fact is germanium can be heated far above 500 degrees centigrade without being damaged.

The defendant argues that this is fatal to the patent because it is a "false specific teaching."

It must be conceded by the plaintiff that the specifications of the Barnes patent does state a scientific error as set forth by the defendant.

■■■ This court cannot agree with the defendant that in the Barnes patent we have a specific teaching that is false. True there is a scientific error but in this case, it is immaterial, " * * * if by the specification the thing to be done is so set forth that it can be reproduced." Eames v. Andrews (1887) 122 U.S. 40, 56, 7 S.Ct. 1073, 1082, 30 L.Ed. 1064.

One cannot deduce from the evidence that this was not so. The world was given something "new" and the world was, " * * * taught how to use it." The teaching in the Barnes patent was sound.

Diamond Rubber Co. v. Consol. Tire Co. 220 U.S. 428, 435–436 [31 S.Ct. 444]. "And how can it take from his merit that he may not know all of the forces which he has brought into operation? It is certainly not necessary that he understand or be able to state the scientific principles underlying his invention, and it is immaterial whether he can stand a successful examination as to the speculative ideas involved."

The testimony clearly establishes that at the time Barnes did his work the pure germanium as it is known today was not available. It contained unknown impurities and that heating above 500 degrees at that time could very readily cause changes in the germanium. (North R 894–895) The fact remains he knew the method and used it with operative success.

It must also be noted that the scientific error in the Barnes patent specification does not appear in the Barnes claims.

It must be concluded that the scientific error stated in the specification does not in any way affect the Barnes patent.

This court fails to find any support for a contrary conclusion from the defendant's argument or its citation of authorities.

The defendant's next argument as to invalidity is based on the contention that the claims in suit of the Barnes patent are anticipated by or rendered obvious by the prior art patent Dunlap No. 2,644,852.

■■■ The patents in question deal with a highly specialized field placing the court in a world of science where controversy is as fertile as the cerebrations of the mystifying minds of its experts. These experts are considered by the court in the same way that it considers ordinary witnesses excepting, of course, that an expert witness gives his opinion and not an observation. The court need not be controlled by, and indeed it has no hesitancy in rejecting, the testimony or the opinion which an expert may give. However, the opinion is evidence which this court may consider. What is such evidence in the case at bar as to this issue?

Professor Hunter certainly did not accept the defendant's argument that Dunlap teaches making P-N junctions by using buttons of N-doped, low melting alloy.

As the defendant's own witness in cross examination, he stated:

" * * * first of all, let me make clear what I'm not suggesting. I'm *not* suggesting that Dr. Jenny didn't teach the industry how to make these junctions. I think he did and I think Dr. Dunlap is admitting this in his reference."

This doesn't leave much room for doubt.

Since we are dealing with the Dunlap patent, it would be folly to disregard his own appraisal. In one of his technical publications he gave credit to Dr. Jenny for originating the alloy junction N-P-N transistor, citing Jenny's 1953 paper in the IRE Journal.

To this we have the added factor that the Dunlap patent was cited by the Patent Office during the prosecution of the Barnes patent. The defendant in oral argument dismissed this by saying, "We think that the Patent Office missed the boat."

This court cannot agree. Though it is not controlled by expert testimony in this instance, it certainly takes it into account in arriving at its conclusion. This is more especially so in the light of their qualifications and their own interests.

It is clear to this court the Dunlap patent deals with fabrication of photocells; its disclosure of an alloy button containing a donor impurity was in connection with the formation of ohmic contacts, not P-N junctions.

It is potent argument, indeed, to say that if such prior art as Dunlap patent really taught what the defendant now says they teach, N-P-N and the P-N-P alloy junction transistors would surely have blossomed at the same time, for the work of Dunlap antedated both of those devices.

It is inescapable and this court so finds that an ordinary skilled reader would not find in Dunlap a teaching of the Barnes invention unless he were reading it with previous knowledge of Barnes teachings and with the purpose of reading into it meanings not otherwise apparent.

The defendant also asserts that the Barnes claims in suit are invalid because anticipated by, or rendered obvious by the Pfann patents No. 2,792,538 and No. 2,950,425. Pfann discloses a so-called "hook collector," in which an extremely thin P-type region was formed between two regions of N-type germanium, by a method involving gold diffusion.

The transistor disclosed was of the P-N-P type; the N-P-N "hook collector" did not have any utility as a transistor.

Much of the same reasoning which this court applied relative to the Dunlap patent is likewise applicable here.

There is little appreciation for defense argument which in its ultimate analysis is contradictory. The defendant on the one hand proposes that and credits Dr. Jenny with teaching the industry how to make N-P-N alloy junction transistors and then through the Pfann patents attempts circumventing this very admission.

He does not overcome the obvious fact that Pfann's N-P-N "hook collector" did not have any utility as a transistor—because no means was disclosed by which an external electrical connection could be made to Pfann's extremely thin P-type region. This cannot be treated lightly.

Here again his own witness, Professor Hunter, testified that the device described by Pfann if connected up into a circuit with the base connected to the germanium chip and the emitter connected at the appropriate place for an emitter to be connected and the collector similarly wired in for the appropriate place for the collector this would act like a P-N-P transistor. The Professor also stated that what he described on direct examination as an N-P-N confirmation is not disclosed by Pfann as having any independent utility in and of itself as a transistor. One need go no further.

This court need not dwell to any extent on the defendant's records of secret laboratory work carried out at Bell Telephone Laboratories between 1950 and 1952. The records were not admitted in evidence as prior art, for the same had been withheld from the public. The de-

fendant so agreed—there is no question about this. The work was held confidential within the Bell Laboratories Technical Staff to the extent that it falls within 35 U.S. Code 102(g) as "concealed."

■ The right to a patent is not affected by abandoned experiments uncommunicated to the public.

In Gillman et al. v. Stern et al. (2 Cir. 1940) 114 F.2d 28, 31 the court stated thus the law on experiments not made public:

"Such a use is clearly not a 'public' one, and such an inventor is not a 'first inventor.' In Gayler v. Wilder, 10 How. 477, 481, 497, 13 L.Ed. 504, the question was whether the condition—which has always been in the statute—that the patentee must be the 'first and original inventor' was defeated by anyone who had earlier conceived the same invention, or only by one who had also in some way made public his results. A majority of the court held that only the second would defeat a patent on the ground that what had not in fact enriched the art should not count; and the doctrine is now well fixed. Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651. Just as a secret use is not a 'public use,' so a secret inventor is not a 'first inventor.'"

It was not part of the prior art and all testimony in connection therewith was directed solely to the defendant's contention that simultaneous use of alloys by numerous persons is evidence of obviousness.

It must be noted the work had no application to the art of making N-P-N alloy junction transistors. Of course, work was done along the same lines Barnes pursued but, without doubt, they found successful fabrication of alloy junction N-P-N transistors difficult and far from obvious. To find otherwise this court would have to disregard such admissions from the very lips of the men involved. It is quite amazing how this defendant relies so heavily on Dr. Jenny, the plaintiff's witness, and yet repeatedly compromises his position. Dr. Jenny himself in his testimony told of his constant research and effort covering a period of over six months.

■ On the basic question whether a patented invention was or was not obvious at the time it was made, the courts apply objective standards, and one of the most dependable is whether the invention filled a long-felt need and was promptly adopted by industry. Other factors significant to the inquiry are the degree of commercial success of the patented product and the extent to which others failed in their quest for the goal (Graham v. John Deere Co. (1966), 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545, and United States v. Adams (1966), 383 U.S. 39, 48–52, 86 S.Ct. 708, 15 L.Ed. 2d 572).

The leading case on the "long-felt want" rule, cited innumerable times, is Carnegie Steel Co. v. Cambria Iron Co. (1902), 185 U.S. 403, 445–446, 22 S.Ct. 698, 46 L.Ed. 968. The invention in that case (the "Jones process") was, on its face, very simple; yet it filled a long-felt need for improved steel making and was widely adopted. The bearing of those facts on patentability was stated by the Supreme Court in this famous passage (185 U.S. at 445–446, 22 S.Ct. at 715):

"It should be borne in mind that this process was one not accidentally discovered, but was the result of a long search for the very purpose. The surprise is that the manufacturers of steel, having felt the want for so many years, should never have discovered from the multiplicity of patents and of processes introduced into this suit, and well known to the manufacturers of steel, that it was but a step from what they already knew to that which they had spent years in endeavoring to find out. It only remains now for *the wisdom which comes after the fact* to teach us that Jones discovered nothing, invented nothing, accomplished nothing.

We cannot better conclude this opinion than by the following extract from the

opinion of Mr. Justice Bradley in Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177, 1181: 'But it is plain from the evidence, and from the very fact that it was not sooner adopted and used, that it did not, for years, occur in this light to even the most skillful persons. It may have been under their very eyes; they may almost be said to have stumbled over it; but *they certainly failed to see it, to estimate its value, and to bring it into notice.* * * * Now that it has succeeded, it may seem very plain to anyone that he could have done it as well. *This is often the case with inventions of the greatest merit.* It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention.' "

The same point was made in Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co. (1911), 220 U.S. 428, p. 435, 31 S.Ct. 444, 447 in these words:

"Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not. It regards a change as evidence of novelty, the acceptance and utility of change as a further evidence, even as demonstration."

█ In other words, the fact that a given invention seems obvious in retrospect is just not relevant. The issue of obviousness is always judged in the light of the *objective facts* as they were when the invention was made. This was well said by our own Court of Appeals in S. D. Warren Co. v. Nashua Gummed & Coated Paper Co. (1 Cir., 1953), 205 F.2d 602, 604–605, supra.

The court refers once more to the Graham v. John Deere Co. case, supra, since the defendant has cited said decision. It is significant, as the plaintiff argues, that his citation omitted reference to this passage from Justice Clark's opinion (383 U.S. at 17–18, 86 S.Ct. at 694):

"Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. See Note, Subtests of 'Nonobviousness': A Nontechnical Approach to Patent Validity 112 U.Pa. L.Rev. 1169 (1964)."

See United States v. Adams et al. (1966) 383 U.S. 39, 86 S.Ct. 708, where patent was sustained despite prior art showing separately all the features which in combination made up the invention.

Now, as to the other prior art recited by the defendant against the Barnes patent, this court finds none of it is even as relevant as the Dunlap and Pfann patents already discussed.

In the Barnes patent, we have the question of both invalidity and infringement.

The burden of proof is on the defendant to prove invalidity. This burden is a heavy one. See Radio Corporation of America et al. v. Radio Engineering Laboratories, Inc., supra.

█ This quantum (every reasonable doubt should be resolved against him) has not been satisfied. This court finds that the defendant has failed to prove its affirmative defense that the Barnes patent is invalid.

The defendant has pleaded laches and estoppel.

The following facts are uncontradicted:

1) The plaintiff became aware of the defendant's activities in 1959. It was at this time it first acquired knowledge of the defendant's product now charged with infringement.

2) Written notice of the infringement was given defendant by the plaintiff on December 28, 1961.

3) The defendant did not know that plaintiff Barnes patent existed when it began infringing.

4) There is no evidence that either the defendant or its predecessors made any effort to acquaint themselves with the patent situation.

The plaintiff argues that following the notice of infringement, the defendant denied infringing Barnes patent and so that patent was not named in the original suit but that after discovery had convinced plaintiff that infringement was in fact taking place, it was added by an amended complaint filed January 15, 1964.

The defendant cites International Shoe Machine Corporation v. United Shoe Machine Corporation (D.Mass.1965) 242 F.Supp. 765; Smith v. Sinclair Refining Company, 2 Cir., 257 F.2d 328. Here there was a fourteen year delay in taking *any* steps to enforce the patent rights. The court characterized the delay as "long delay" not just a delay.

The factual situation of the case at bar does not fall within the scope of the defendant's authorities. The delay from 1959 to 1961 was only of a two year duration. From this point on steps were taken to enforce the plaintiff's patent rights which is far different from the factual situation in the defendant's case of a fourteen year delay in taking "any" steps.

■■ As argued by the plaintiff, the interval between plaintiff's first knowledge of. defendant's infringement and active assertion of plaintiff's rights was substantially less than six years. This does not raise a laches bar against either injunctive relief or recovery of damages. B. F. Sturtevant Co. v. Massachusetts Hair & Felt Co. (1 Cir. 1941) 122 F.2d 900, 911; France Mfg. Co. v. Jefferson Electric Co. (6 Cir. 1939) 106 F.2d 605, 609. Further it must be noted that in this case the plaintiff's prayer for damages extends only to infringement oc-curring after the date on which defendant was given written notice of infringement (December 28, 1961).

It is this court's opinion that the so-called delay in question was of too short a duration to say it led to the injuries of which the defendant complains.

■■■ The doctrine of estoppel cannot be invoked. To do so, the party invoking it must prove that he was misled by his opponents' silence or inaction and that he affirmatively changed his position to his detriment in reliance thereon. Codell v. American Surety Co. et al. (6 Cir. 1945) 149 F.2d 854, 857. This court fails to find that this has taken place in the case before it. On the contrary, we have a situation of a defendant attempting to shield itself with this doctrine where in fact it exploited the plaintiff's invention. They did nothing to acquaint themselves with the patent situation. The record is totally devoid of evidence as to any efforts in this regard.

B. F. Sturtevant Co. v. Massachusetts Hair & Felt Co. (1 Cir. 1941) 122 F.2d 900, 911; Alliance Securities Co. v. De Vilbiss Mfg. Co. (6 Cir. 1930) 41 F.2d 668, 670; Shaffer et al. v. Rector Well Equipment Co., Inc. (5 Cir. 1946) 155 F.2d 344, 347; Duval Sulphur & Potash Company v. Potash Company of America (10 Cir. 1957) 244 F.2d 698, 701–702.

The asserted defenses of laches and estoppel is rejected by this court.

As to the Barnes patent, this court concludes as a matter of law that:

A) The Barnes patent in suit, No. 2,-742,383, has been the sole property of the plaintiff at all times since its issuance, and its claims 2, 4, 10 and 11 are good and valid in law.

B) The defendant, within the six years next preceding the filing of the amended complaint in this action, has infringed claims 2, 4, 10 and 11 of U. S. Patent No. 2,742,383 by manufacturing and selling N-P-N alloy junction germanium transistors embodying the invention covered and protected by such claims.

C) The defendant has failed to establish a basis in fact or law for its plea that the plaintiff's rights of action against it with respect to patent number 2,742,383 is barred by laches and estoppel.

D) Plaintiff is entitled to recover from defendant its legal damages provided by law for the defendant's aforesaid acts of infringement occurring since December 28, 1961, the date on which the plaintiff gave defendant a written notice of such infringement. Plaintiff is also entitled to recover from defendant its statutory costs incurred in the prosecution of this action. An accounting to determine the amount of such damages and costs is hereby ordered, its commencement, however, to await the conclusion of any appellate proceedings taken from the interlocutory judgment entered concurrently herewith, or until the expiration of the time for the taking of an appeal therefrom, whichever shall last occur.